956 A.2d 861

**Zi'Tashia JACKSON, a Minor, et al.**

v.

**The DACKMAN COMPANY, et al.**

**No. 1080 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 10, 2008.

552

Brian S. Brown (Saul E. Kerpelman & Associates, PA on the brief), Baltimore, for appellant.

James R. Benjamin, Jr. (Thomas J. Whiteford, Whiteford, Taylor & Preston, LLP on the brief), Baltimore, for appellee.

Argued before WRIGHT, J. FREDERICK SHARER,* JJ.

WRIGHT, J.

Zi'Tashia Jackson, a minor, and Tameka Jackson ("appellants") appeal from a decision of the Circuit Court for Baltimore City. We are asked to determine:

I) whether Md.Code (2007 Repl.Vol.), § 6–801 *et seq.* of the Environment Article ("Envir."), The Reduction of Lead Risk in Housing Act ("Statute"), is constitutional;

II) whether appellees, The Dackman Company, Jacob Dackman & Sons, LLC, Elliott Dackman, and Charles Skirven, complied with the Statute and were, thus, entitled to qualified immunity;

III) whether the Statute applies to persons at risk who have elevated blood lead ("EBL") levels below 25 micrograms per deciliter ("µg/dl"); and

IV) whether the Statute bars actions, pursuant to Maryland's Consumer Protection Act ("CPA"), where prop-

---

* J. Frederick Sharer, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

erty owners are in full compliance with the Statute's edicts.

In review of these four issues, we affirm the decision of the circuit court with respect to I, III and IV, and reverse with respect to II.[1]

## PROCEDURAL HISTORY

On July 11, 2002, Zi'Tashia Jackson ("Zi'Tashia"), through her mother and next friend, Tameka Jackson ("Ms.Jackson"), filed a complaint against the appellees. In the complaint, appellants alleged that Zi'Tashia was exposed to chipping, peeling, and/or flaking lead-based paint, while residing at 1233 Cliftview Avenue and at 706 Mt. Holly Avenue. The rental units are located in Baltimore City and are owned, managed, and/or operated by the appellees. Appellants further claimed that Zi'Tashia sustained severe and permanent brain injuries, as well as cognitive and behavioral deficits, as a result of Zi'Tashia's exposure to lead-based paint at both properties. Appellants alleged that appellees violated the CPA and were negligent in failing to properly maintain and safeguard the properties against the presence of chipping, flaking, and/or peeling paint. Ms. Jackson also brought her own claim against the appellees.

On March 13, 2003, appellants filed a First Amendment by Interlineation. Appellees filed a motion for summary judgment, and, on March 14, 2003, the Circuit Court for Baltimore City, Judge M. Brooke Murdock presiding, denied the motion to allow for further discovery. On March 25, 2003, the appellees filed an answer to the amendment. On November 2, 2006, after extensive discovery, appellees filed a second motion for summary judgment and a memorandum in support thereof. Appellants opposed this motion by filing three memoranda of their own.

---

1. This opinion was originally issued as an unreported decision on June 5, 2008. We are reissuing this decision as reported after a timely request by one of the parties.

On November 30, 2006, the State of Maryland, Department of the Environment ("MDE"), filed a Memorandum of Law of *Amicus Curiae.* On December 5, 2006, appellants filed an opposition to appellees' second motion for summary judgment, along with a memorandum of points and authorities, in support thereof. On the same date, appellees filed an opposition to appellants' motion concerning the application and/or constitutionality of the Statute. On December 13, 2006, appellees filed a reply to appellants' opposition to appellees' second motion for summary judgment.

A hearing on all open motions was held on December 19, 2006. The trial court, Judge Robert B. Kershaw presiding, held the matter *sub curia* and issued a memorandum opinion and order on February 1, 2007, granting appellees' second motion for summary judgment, in part, and denying it, in part. The court determined that the Statute was constitutional and found that (1) the Statute did not violate appellants' right to a jury trial; (2) the Statute did not impermissibly restrict appellants' right to access the courts, nor did it restrict appellants' right to remedy; (3) the Statute did not violate Maryland's constitutional mandate on separation of powers; and (4) the Statute did not violate appellants' right to equal protection under the law. Furthermore, the court found that the Statute applies to persons with an EBL level under 25 µg/dl and that the Statute barred actions brought pursuant to the CPA, where property owners were in full compliance with the Statute's edicts. Lastly, the court ruled that there was a dispute of fact with regard to appellees' compliance with the Statute, during certain periods of time, and, therefore, denied appellees' motion for summary judgment in that matter.

The case was called to trial on July 7, 2007, and the parties agreed to proceed by stipulated facts.[2] This stipula-

---

2. To comply with the Statute, and receive the benefit of the immunity that it provides, appellees needed to certify that the properties complied with the Statute's mandates. To do this, appellees had to register the properties with MDE and renew the registration annually. A month prior to the trial, the parties stipulated that for calendar years 1997, 1998, 1999, and 2000, appellees sent registration renewals to MDE on

tion was put on the record at a pre-trial motion hearing before the circuit court, Judge Gale E. Rasin presiding. As part of the pre-trial motion hearing, appellees' second motion for summary judgment, which had been previously denied, was renewed. After hearing arguments, the court ruled that appellees' filings were timely and that appellees were fully compliant with the Statute, thereby affording them protection from suit. Accordingly, on June 18, 2007, final judgment was entered in appellees' favor on all counts.

On July 17, 2007, both parties filed a joint motion to alter or amend, to correct clerical errors that, technically, prevented the entry of a final judgment for purposes of this appeal. The court granted the joint motion on August 1, 2007, and appellants filed this timely appeal on August 13, 2007.

## FACTS

Zi'Tashia Jackson was born on January 12, 1997. At the time of her birth, her mother, Tameka Jackson, was living at 1904 E. Lanvale Street in Baltimore City. When Zi'Tashia was one year old, she and Ms. Jackson moved to 1233 Cliftview Avenue ("Cliftview"). The tenants of record at Cliftview, during appellants' residency, were Takia and Tasha Jackson, Zi'Tashia's maternal aunts. Appellants lived at Cliftview for approximately one year before they moved to 706 Mt. Holly ("Mt.Holly"). The tenants of record at Mt. Holly, during appellants' residency, were Ms. Jackson and Dia Lawrence ("Mr.Lawrence"), Zi'Tashia's father. Appellants and Mr. Lawrence lived at Mt. Holly for approximately six months.

## I. 1233 CLIFTVIEW AVENUE

Pursuant to § 6–811 of the Statute, appellees initially registered Cliftview with MDE on March 24, 1995. On February 19, 1997, pursuant to § 6–815 of the Statute, the interior and exterior of Cliftview underwent a full risk-reduction and in-

---

or before December 31 of those years. The parties also stipulated that these renewals were not marked as received until January 26, 1998, January 7, 1999, January 11, 2000, and January 5, 2001, respectively.

spection, whereby it was determined that the property met certification criteria and the standards mandated by the Statute. Pursuant to § 6–818 of the Statute, the full risk-reduction and inspection was conducted by an independent licensed inspector, who was accredited by the State of Maryland. The inspector determined that the interior and exterior paint, the window sashes, jambs, wells, and sills were in satisfactory condition. Consequently, an inspection certificate was submitted to MDE.

On March 27, 1997, Zi'Tashia's aunts executed a lease for a month-to-month tenancy at Cliftview, to commence April 1, 1997. The lease included a lead paint disclosure form, lead poisoning information packets (as required by § 6–823 of the Statute), and notices of tenant's rights (as required by § 6–820 of the Statute). Before executing their lease, Zi'Ta shia's aunts were required to inspect the property and identify, in writing, any defective conditions that were present, including any chipping, flaking, and/or peeling paint. Zi'Tashia's aunts executed the leases, and they did not reference any chipping, flaking, or peeling paint. They did, however, list Zi'Tashia as one of the children residing or frequently visiting Cliftview.

While residing at Cliftview, appellants allege that Zi'Tashia was lead-poisoned. Zi'Tashia had a blood lead level of 21 μg/dl on October 22, 1998, and 16 μg/dl on November 18, 1998. Appellees, however, never received a notice of defect/notice of EBL level regarding Zi'Tashia. Thus, appellees believed that, pursuant to § 6–819 of the Statute, corrective measures at the property—such as modified risk reductions—were not necessary.

## II. 706 MT. HOLLY AVENUE

Pursuant to § 6–811 of the Statute, appellees registered Mt. Holly with MDE on March 24, 1995. On January 8, 1999, pursuant to § 6–815 of the Statute, the interior and exterior of Mt. Holly underwent a full risk-reduction and inspection, wherein it was determined that the property met certification criteria and complied with the standards mandated by the

Statute. Pursuant to § 6–818 of the Statute, the full risk-reduction and inspection was conducted by an independent licensed inspector, who was accredited by the State of Maryland. The inspector determined that the interior and exterior paint, the window sashes, jambs, wells, and sills were in satisfactory condition. As such, an inspection certificate was submitted to MDE.

On January 29, 1999, Ms. Jackson and Mr. Lawrence executed a lease for a month-to-month tenancy at Mt. Holly, to commence February 1, 1999. The lease included a lead paint disclosure form, lead poisoning information packets (as required by § 6–823 of the Statute), and notices of tenant's rights (as required by § 6–820 of the Statute). Before executing their lease, Ms. Jackson and Mr. Lawrence were required to inspect the property and identify, in writing, any defective conditions that were present, including any chipping, flaking, and/or peeling paint. Ms. Jackson and Mr. Lawrence executed the leases, and they did not reference any chipping, flaking, or peeling paint. They did, however, list Zi'Tashia as one of the children residing or frequently visiting Mt. Holly.

Zi'Tashia and her family were evicted from Mt. Holly on August 12, 1999. While residing at Mt. Holly, appellants allege that Zi'Tashia was lead-poisoned. Zi'Tashia had a blood lead level of 15 µg/dl on February 5, 1999, and 9 µg/dl on January 21, 2000. Appellees, however, never received a notice of defect/notice of EBL level regarding the appellant. Thus, appellees believed that, pursuant to § 6–819 of the Statute, corrective measures at the property—such as modified risk reductions—were not necessary.

## STANDARD OF REVIEW

The Circuit Court for Baltimore City granted appellees' motion for summary judgment on all counts. This Court reviews an order granting summary judgment de novo. *Todd v. Mass Transit Admin.*, 373 Md. 149, 154, 816 A.2d 930 (2003) (citations omitted). The proper scope of appellate review turns on whether the court below was "legally correct." *Lo-*

*pata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24 (1998). If no material facts are disputed, we determine whether the circuit court correctly granted judgment as a matter of law. *Todd,* 373 Md. at 155, 816 A.2d 930.

### DISCUSSION

The Reduction of Lead Risk in Housing Act is codified primarily in Title 6, Subtitle 8 of the Environment Article. Enacted by the 1994 General Assembly, it became effective on February 24, 1996. The Statute was intended "to reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing." Envir. § 6–802.

The Statute is based on recommendations made by the Lead Paint Poisoning Commission ("Commission"), which was established by the Legislature in 1992 to comprehensively examine childhood lead poisoning and recommend a legal framework. Members of the Commission included property owners, health and child advocates, housing experts, and representatives of other interest groups. In December 1993, the Commission presented its draft report ("Commission Report") to the General Assembly.[3] The Commission Report identified childhood lead poisoning as the number one preventable environmental disease affecting children in the United States and concluded:

1) One of the most important sources of exposure to lead paint is lead-contaminated dust in older housing with deteriorated lead paint;

2) the practice of ordering full abatement after identification of a lead-poisoned child residing in the property has not been an effective solution;

3) a preventive approach is needed;

4) owners of low and moderate income rental housing generally cannot afford to make the expenditures necessary

---

**3.** The Commission Report was finalized in May 1994. There were no significant differences between the draft and final reports.

to entirely remove lead hazards from all of their properties without substantially increasing rents;

5) tenants cannot absorb significant rent increases;

6) performance of lead hazard reduction treatments that fall short of full abatement would be considerably less costly;

7) the current tort system, in which landlords are subject to costly lawsuits and the threat of litigation, discourages landlords from renting to families with children, particularly those with elevated blood lead;

8) the general unavailability of liability insurance covering lead risks has decreased the marketability of older rental properties, thereby preventing property owners from obtaining financing to perform abatements; and

9) the most important component of successfully treating lead poisoning is to remove the child from the leaded environment.

*See* Report of the Lead Paint Poisoning Commission, 3–7 (May 5, 1994).

The Statute implemented the Commission's recommendations. It has four principal components. First, it establishes a mandatory lead hazard risk-reduction standard for all residential rental properties built before 1950 ("Affected Property"). Envir. §§ 6–815, 6–817, 6–819. Second, the Statute provides a compensation mechanism for children under the age of six and pregnant women ("Persons at Risk") living in Affected Properties that are in compliance with the law but who, nonetheless, suffer from EBL levels. Envir. § § 6–828– 6–842. Third, the Statute provides an incentive for property owners to comply by affording them the opportunity to limit their liability to Persons at Risk. Envir. §§ 6–835, 6–836. Fourth, the Statute requires insurers to provide lead hazard liability coverage to compliant property owners. Md.Code (2006 Repl.Vol.) §§ 19–701 *et seq.* of the Insurance Article.

Owners of Affected Properties that are not certified as lead-free must comply with all applicable provisions of the Statute by:

1) registering the properties with MDE and renewing the registration annually; Envir. §§ 6–811, 6–812.

2) bringing the properties into compliance with the full risk-reduction standard at the first change in occupancy after February 23, 1996, and at every change in occupancy thereafter; Envir. § 6–815(a).

3) bringing the properties into compliance with the modified risk-reduction standard within 30 days following receipt of a notice of defect, or receipt of notice that a Person at Risk with an EBL level of 15 µg/dl or more prior to February 24, 2006, or 10 µg/dl or more on or after February 24, 2006, resides in the unit; Envir. § 6–819; and

4) providing the tenant, by verifiable method, a copy of the current verified inspection certificate, a lead poisoning informational packet, and a Notice of Tenant's Rights package. This must be done at the inception of each tenancy and every two years thereafter. Envir. § § 6–820, 6–823.

By February 24, 2001, property owners were required to have at least fifty percent of their Affected Properties in compliance with the full risk-reduction standard, regardless of whether there was a change of occupancy. Envir. § 6–817. On and after February 24, 2006, property owners were required to have one hundred percent of their Affected Properties in compliance with a risk-reduction standard. Envir. §§ 6–817, 6–819(e).

The Statute bars Persons at Risk from filing civil suits for damages as a result of alleged ingestion of lead paint while residing in an Affected Property that is in compliance with the Statute at the time of the alleged ingestion. Envir. §§ 6–828, 6–836. If a Person at Risk is diagnosed with an EBL level of (1) 25 µg/dl or more, on or after February 24, 1996; (2) an EBL level of 20 µg/dl or more, on or after February 24, 2001; (3) or an EBL level of 15 µg/dl or more, on or after February 24, 2006, a property owner must make the Person at Risk a qualified offer (within 30 days of receiving written notice of

the EBL), to maintain limited liability protection. Envir. §§ 6–828, 6–831. This qualified offer must cover relocation expenses, up to $9,500.00, to allow the family of the Person at Risk to move to lead-safe housing. Envir. § 6–840. Relocation expenses include a rent subsidy of up to 150% of the tenant's existing monthly rent, for the period until the Person at Risk reaches the age of 6 years, or, in the case of a pregnant woman, until the child born as a result of that pregnancy reaches the age of 6 years. *Id.* Relocation expenses also include incidentals that may be incurred by the household, such as transportation and child care fees. *Id.* The property owner's qualified offer must also pay for all medically necessary, uninsured medical expenses associated with treatment of the EBL, either up to $7,500.00, or until the child reaches the age of 18. Envir. §§ 6–839, 6–840. Furthermore, the qualified offer must include the owner's certification that he has complied with registration, risk-reduction, and tenant notification requirements. Envir. § 6–839(c).

Acceptance of the qualified offer releases a property owner from all further liability to the Person at Risk, with regard to the EBL allegedly caused by ingestion of lead in the Affected Property. Envir. § 6–835. Rejection of the qualified offer also releases an owner from liability, if the property owner complied with the Statute. Envir. § 6–836. On the other hand, a tenant may reject the qualified offer and file suit, if the property owner was not in compliance with the Statute during the time of the alleged ingestion. Envir. §§ 6–836, 6–838. In an action for damages by a Person at Risk, the property owner's failure to comply with risk-reduction or distribution of educational materials creates a rebuttable presumption of negligence. Envir. § 6–838.

## I. The Reduction of Lead Risk in Housing Act is Constitutional.

Appellants contend that the Statute violates the constitutions of the United States of America and of the State of Maryland. Specifically, appellants argue that the Statute (1) violates their right to a jury trial and access to courts under

the Seventh Amendment of the U.S. Constitution and under Articles 5, 20, and 23 of the Maryland Constitution Declaration of Rights ("Declaration"); (2) violates their right to access courts and remedies under Article 19 of the Declaration; (3) violates due process and equal protection of the law, under the 14th Amendment of the U.S. Constitution and Article 24 of the Declaration; and (4) violates Article 8 of the Declaration, which addresses Separation of Powers.

We disagree and discuss those issues, in that order.

### A. *The Right to a Jury Trial*

■ Appellants argue that the Statute violates their right to a jury trial under the Seventh Amendment of the United States Constitution.[4] The Seventh Amendment, however, "does not apply to the states." *Consumer Prot. Div. v. Morgan,* 387 Md. 125, 189, 874 A.2d 919 (2005) (citing *Md. Aggregates Ass'n, Inc. v. State,* 337 Md. 658, 681 n. 14, 655 A.2d 886 (1995)). Thus, the Seventh Amendment cannot be the basis of a challenge to the constitutionality of the Statute's provisions.

■ Next, appellants argue that the Statute violates their right to a jury trial under Articles 5, 20, and 23 of the Declaration. Article 5 of the Declaration provides:

> That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes ... and also of all Acts of Assembly ... except such as may have since expired, or may be inconsistent with the provisions of this Constitution; *subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State ...*

---

**4.** The Seventh Amendment provides:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court *of the United States,* than according to the rules of the common law.

U.S. Const. amend. VII (emphasis added).

(Emphasis added). Therefore, Maryland is "subject to the common law, except where it has been changed or modified by legislative action." *Shaw v. Glickman*, 45 Md.App. 718, 727, 415 A.2d 625 (1980). In other words, the right to a jury trial exists only to the extent that it has not been abrogated by the Legislature. In this case, the General Assembly removed the right to trial by jury by enacting the Statute.

■ Appellants attempt to strengthen their argument by citing Article 20 of the Declaration, which states: "That the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the People." Article 20 has primarily been treated as a venue provision. *See, e.g., Greco v. State*, 307 Md. 470, 474, 515 A.2d 220 (1986); *Lodowski v. State*, 302 Md. 691, 707, 490 A.2d 1228 (1985), *vacated on other grounds by* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986), *on remand*, 307 Md. 233, 513 A.2d 299 (1986), *and cert. denied*, 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). Thus, the circuit court did not violate the appellants' rights with regard to Article 20, because the trial was, in fact, held in Baltimore City—where Zi'Tashia's alleged injury arose. Furthermore, the parties agreed to proceed by stipulated facts, rendering a "trial of facts" unnecessary.

■ Appellants' argument, rooted in Article 23,[5] also fails, for this reason. While Article 23 guarantees the right to a trial by jury in civil proceedings, the right applies, specifically, to all *issues of fact*. In this case, no material facts were disputed at trial, so there was no issue for the jury. Instead, the question of limited liability under the Statute became an *issue of law*. Furthermore, there was no violation of Article 23 because the Legislature, by enacting the Statute, abrogated the common law cause of action. In *Murphy v. Edmonds*, 325 Md. 342, 372, 601 A.2d 102 (1992), the Court of Appeals stated:

---

**5.** Article 23 of the Declaration provides:

The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $10,000, shall be inviolably preserved.

Where, however, the General Assembly has provided that a matter shall not be resolved in a judicial proceeding, by legislatively abrogating or modifying a cause of action, no question concerning the right to a jury trial arises.

As such, in this case "there is no cause of action [and] . . . nothing to which the right of trial by jury can attach." *Jacobs v. Adams*, 66 Md.App. 779, 798, 505 A.2d 930 (1986).

B. *The Right of Access to Courts and Remedy*

 Appellants argue that Section 6–828(b) [6] of the Statute violates Article 19 of the Declaration, which states:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

"The 'law of the land' in Article 19 is the same due process of law required by the fourteenth amendment." *Attorney Gen. v. Johnson*, 282 Md. 274, 298, 385 A.2d 57 (1978) (citing *In re Easton*, 214 Md. 176, 187, 133 A.2d 441 (1957)). "A statutory restriction upon access to the courts violates Article 19 only if the restriction is unreasonable." *Murphy*, 325 Md. at 365, 601

---

**6.** This Section states:

(b) *In general.*—A person may not bring an action against an owner of an affected property for damages arising from alleged injury or loss to a person at risk caused by the ingestion of lead by a person at risk that is first documented by a test for EBL . . . unless the owner has been given:

(1) Written notice from any person that the elevated blood level of a person at risk is:

(i) Greater than or equal to 25 ug/dl as first documented by a test for EBL performed between February 24, 1996 and February 23, 2001, inclusive;

(ii) Between February 24, 2001 and February 23, 2006, inclusive, an EBL greater than or equal to 20 ug/dl as first documented by a test for EBL performed between February 24, 2001 and February 23, 2006, inclusive; or

(iii) On or after February 24, 2006, an EBL greater than or equal to 15 ug/dl as first documented by a test for EBL performed on or after February 24, 2006; and

(2) An opportunity to make a qualified offer . . .

Envir. § 6–828(b).

A.2d 102 (citations omitted). In this case, we hold that the restriction imposed by the Statute is reasonable.

■ In enacting the Statute, the Legislature's goal was to reduce childhood lead poisoning, while maintaining the stock of affordable rental housing. Based upon the Commission Report, the Legislature reasonably concluded that capping liability and limiting exposure to costly litigation (for landlords who comply with the statute) would provide an incentive to bring older rental properties into compliance with the law, thereby reducing lead hazards, without restricting housing stock. It was also reasonable for the Legislature to conclude that the provisions of the Statute and the terms of a qualified offer, if applicable, would result in Persons at Risk having safe housing, prompt relocation, and medical care if, in spite of the landlord's compliance, lead exposure occurs. Furthermore, the Legislature's decision to set decreasing levels of EBL through time was a reasonable restriction of access to courts because it was based on data presented by the Commission.

Next, appellants assert that the Statute restricts their access to remedy. The Court of Appeals has upheld statutes that abrogate or limit causes of action when they bear a reasonable relationship to legitimate legislative goals. For example, in *Hill v. Fitzgerald,* 304 Md. 689, 691, 705, 501 A.2d 27 (1985), the Court upheld an amendment to a statute of limitations governing medical malpractice actions in which a cause of action had accrued prior to the amendment, finding that it did not violate Article 19. The Court held that, if rights have vested in a case, the Legislature cannot enact "a statute of limitations applicable to an existing cause of action in such a way as to preclude any opportunity to bring suit." *Id.* at 702, 501 A.2d 27 (citing *Allen v. Dovell,* 193 Md. 359, 363–64, 66 A.2d 795 (1949)). The Court further noted that because "common law is subject to legislative change, there is no vested right in any common law rule." *Hill,* 304 Md. at 703, 501 A.2d 27 (citing *Munn v. Illinois,* 94 U.S. (4 Otto) 113, 134, 24 L.Ed. 77 (1876)).

Likewise, "[s]everal restrictions upon traditional remedies or access to the courts have been upheld under Article 19 as reasonable." *Piselli v. 75th St. Med.*, 371 Md. 188, 206, 808 A.2d 508 (2002). For example, the Court of Appeals indicated that "the Legislature may reasonably limit the amount of damages recoverable in tort cases for non-economic damages without violating Article 19." *Id.* at 207, 808 A.2d 508 (citing *Murphy v. Edmonds*, 325 Md. at 366, 601 A.2d 102). The Court of Appeals has also held that "the Legislature may ordinarily substitute a statutory remedy, including a statutory administrative and judicial review remedy, for a common law remedy without violating Article 19 of the Declaration of Rights." *Robinson v. Bunch*, 367 Md. 432, 446–47, 788 A.2d 636 (2002).

■ "Where a person clearly has a right to money or property under a statute or common law principle, *and no statute specifically provides for a remedy*, Article 19 guarantees a common law remedy to enforce the right." *Piselli*, 371 Md. at 206, 808 A.2d 508 (citing *Robinson*, 367 Md. at 444, 788 A.2d 636) (emphasis added). In this case, appellants argue that, under the Statute, remedy is provided only to the injured child's parents and "there is no remedy actually given *to the injured child*." We disagree and hold that the Statute specifically provides several remedies to the injured child. First, the Statute allows the plaintiff to pursue existing remedies if the Property Owner does not comply with the Statute. Second, the Statute gives Persons at Risk the benefit of living in compliant housing by having Property Owners perform inspections regularly. Third, the Statute gives Persons at Risk the benefit of getting immediate lead-reduction treatments, so long as they notify the Property Owner, in writing, of defective conditions. Fourth, Persons at Risk are entitled to qualified offers that include relocation and medical expenses.

Because the restrictions on access and remedy imposed by Section 6–828(b) of the Statute are reasonable, we hold that the Statute does not violate Article 19 of the Declaration.

## C. *Due Process and Equal Protection*

Appellants argue that the Statute violates their right to equal protection, as guaranteed by the Declaration, Article 24.[7] In so arguing, appellants contend that the Statute creates two statutory classifications:

1) a division between children injured, specifically, by lead paint and all other injured children; and

2) a division between children who suffer from an EBL level above 25 µg/dl and children who suffer from an EBL level below 25 µg/dl.

In *Murphy,* 325 Md. at 353–54, 601 A.2d 102, the Court of Appeals stated:

> Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment . . .
>
> [W]e have consistently taken the position that the Maryland equal protection principle applies in like manner and to the same extent as the Equal Protection Clause of the Fourteenth Amendment. Thus, United States Supreme Court opinions concerning the Equal Protection Clause of the Fourteenth Amendment are practically direct authorities with regard to Article 24 of the Declaration of Rights.

(Citations omitted).

In reviewing classifications challenged under equal protection guarantees, we consider the three standards that have evolved in Maryland: (1) strict scrutiny, (2) intermediate scrutiny,[8] and (3) rational basis. *Id.* at 355–58, 601 A.2d 102.

---

7. Article 24 states:

 That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

8. "Intermediate scrutiny" has also been referred to as "heightened scrutiny." *See City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■■■ First, "[e]qual protection analysis requires strict scrutiny of a legislative classification when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Wheeler v. State*, 281 Md. 593, 601, 380 A.2d 1052 (1977). "Laws which are subject to this demanding review violate the equal protection clause unless the State can demonstrate that such laws are necessary to promote a compelling governmental interest." *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 706, 426 A.2d 929 (1981) (citations omitted).

■■■ Second, "classifications which have been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which have not been deemed to involve suspect classes or fundamental rights and thus have not been subjected to the strict scrutiny test," are reviewed under intermediate scrutiny. *Murphy*, 325 Md. at 357, 601 A.2d 102. In order to be sustained, this type of classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). "There is no brightline diagnostic, annunciated by either [the Court of Appeals] or the U.S. Supreme Court, by which a suspect or quasi-suspect class may be recognized readily." *Conaway v. Deane*, 401 Md. 219, 277, 932 A.2d 571 (2007). The Court of Appeals, however, has adopted "criteria used by the Supreme Court in assessing claims of a new suspect or quasi-suspect classification." *Conaway*, 401 Md. at 279, 932 A.2d 571. They are as follows:

(1) whether the group of people disadvantaged by a statute display a readily-recognizable, obvious, immutable, or distinguishing characteristics that define the group as a discrete and insular minority;

(2) whether the impacted group is saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process; and

(3) whether the class of people singled out is subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities to contribute meaningfully to society.

*Id.* at 278, 932 A.2d 571 (citations omitted).

 Third, "[i]n most instances when a governmental classification is attacked on equal protection grounds, the classification is reviewed under the ... 'rational basis' test." *Murphy,* 325 Md. at 355, 601 A.2d 102. "Generally under that test, a court will not overturn the classification unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the governmental actions were irrational." *Id.* (citations omitted). "The Supreme Court, in applying this test, has been willing to uphold the constitutionality of an enactment when 'any state of facts reasonably may be conceived to justify it.'" *Waldron,* 289 Md. at 707, 426 A.2d 929 (quoting *McGowan v. State of Md.,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

 In this case, analysis of the Statute under a strict scrutiny standard is improper because the Statute neither interferes with the exercise of a fundamental right, nor does it operate to the peculiar disadvantage of a suspect class. "If a statutory classification constitutes a reasonable restriction upon access to the courts under Article 19, the fact that the classification may implicate access to the courts does not require that heightened scrutiny be applied in equal protection analysis." *Murphy,* 325 Md. at 367, 601 A.2d 102. Furthermore, the Statute does not burden a "suspect class" because it is neutral on its face and it applies evenhandedly to all children under the age of six, regardless of race or national origin. Appellants assert that the Statute has "created a *de facto* racial classification" because "[p]oor and minority children are poisoned from lead-based paint in a disproportionate number." The assertion that the law may disproportionately affect members of one racial group, even if true, is not enough to overturn an otherwise valid law. *See Jefferson v. Hackney,*

406 U.S. 535, 548–49, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (holding that the state's system for allocating its fixed pool of welfare money did not violate the Fourteenth Amendment, despite a statistically disproportionate impact on African-and Mexican–Americans). Instead, any challenge to a racially neutral law must show that the law was created, or is maintained, for a racially discriminatory purpose. *Id.* at 549, 576, 92 S.Ct. 1724. In this case, there is nothing in the record to demonstrate that the Maryland Legislature enacted the Statute with a racially discriminatory intent or purpose.

In addition, review under strict scrutiny is improper because low economic status is not recognized as a "suspect class." Legislative actions that burden poor people as a class are subject to the rational basis test. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ("In the area of economics and social welfare ... statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." (citation omitted)). This is true even if a legislative act has the effect of burdening access to the courts by indigent citizens. *See U.S. v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) ("[B]ankruptcy legislation is in the area of economics and social welfare ... [thus] the applicable standard, in measuring the propriety of Congress' classification, is that of rational justification." (citations omitted)).

Analysis of the Statute under intermediate scrutiny is also improper, in this case. Appellants, in their brief, compare the children affected by the Statute to "all other persons negligently exposed to toxins." After making the same comparison, we hold that the children with increased EBL levels do not display a readily-recognizable, obvious, immutable, or distinguishing characteristic that defines them as a discrete and insular minority. *Compare Cleburne,* 473 U.S. at 435, 438, 105 S.Ct. 3249 (holding that mental retardation is not a "quasi-suspect" classification to be assessed under intermediate scrutiny; instead, "a lesser standard of scrutiny is appropriate"), *with Graham v. Richardson,* 403 U.S. 365, 372, 91

S.Ct. 1848, 29 L.Ed.2d 534 (1971) (finding that "[a]liens as a class are a prime example of a discrete and insular minority") (citing *U.S. v. Carolene Prods. Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). We further hold that the affected children have not been subjected to a history of purposeful, unequal treatment, nor have they been relegated to a position of political powerlessness, so as to command extraordinary protection. *Cf. Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (finding that "such persons, unlike . . . those who have been discriminated against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"). Moreover, we do not believe that the affected children have been subjected to unique disabilities on the basis of stereotyped characteristics. *See id.*

Appellants contend that intermediate scrutiny is warranted because "the duty of the courts to protect the legal rights of children and the 'best interest of the child doctrine' mandates heightened scrutiny." Neither of the cases that appellants cite, however, is relevant to determining the level of scrutiny required by this case.[9] Appellants also contend that the Statute "warrants heightened scrutiny in that it significantly interferes with an important fundamental right." This argument fails because, as we previously stated, "the fact that the classification may implicate access to the courts does not require that heightened scrutiny be applied in equal protection analysis." *Murphy, supra*, 325 Md. at 367, 601 A.2d 102.

---

**9.** Appellants cite *Berrain v. Katzen*, 331 Md. 693, 629 A.2d 707 (1993) (holding that "the trial court has a special duty to protect the rights and interests of [a] minor plaintiff," represented by next friend, to insure that the next friend does not prejudice the minor's rights and interests through conflict of interest, fraud, or neglect); and *Fulton v. K & M Assocs.*, 331 Md. 712, 629 A.2d 716 (1993) (upholding *Berrain* in finding that the trial court "abused its discretion in denying the voluntary dismissal of [a] child's claim without prejudice").

██ Because strict and intermediate scrutiny are inappropriate in this case, we apply the rational basis standard of review. As stated above, the Legislature enacted the Statute with the intent "to reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing." Envir. § 6–802. At the time it was enacted, the Legislature concluded, based on the Commission Report, that lead paint was widespread, in relation to the general stock of low and moderate-income rental housing. As a result, the unlimited civil liability of property owners in lead paint cases diminished the availability of such housing. Relying on the Commission Report, the Legislature also concluded that, based upon the number and severity of EBL levels in Baltimore City and statewide, requiring a qualified offer would reduce lead poisoning while maintaining a stock of safe, affordable housing. The Legislature further found that limiting exposure to civil actions would create an incentive for landlords to bring properties into compliance with risk-reduction standards. At the same time, qualified offers would result in prompt relocation of lead-poisoned children to safe housing, and in payment of uncovered medical expenses. In review, we hold that the Legislature's actions were rational and that they were related to the legitimate purpose of reducing the incidence of childhood lead poisoning while maintaining the stock of available affordable rental housing.

Appellants next contend that the limited liability provisions of the Statute are illogical because the law presumes that a child can be lead-poisoned while residing in a property that is in compliance with the Statute. The Legislature, however, did not intend to completely eliminate lead poisoning; it merely intended to "reduce the incidence" of EBL. *See* Envir. § 6–802. In this case, lead hazard reduction treatments are a legitimate means to reduce the presence of lead-contaminated dust in properties.

██ Appellants further argue that the Commission Report presented the Legislature with "anecdotal 'evidence'" and that, in fact, "there is no evidence that lead poisoning actions

are the main ... determinant of the availability of affordable housing." The Supreme Court, however, has previously held:

A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative [sic] every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific.

*Heller v. Doe*, 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citations omitted). Therefore, under a rational basis analysis, a court is not free to second-guess the wisdom or desirability of legislative policy determinations. For these reasons, we hold that the Statute does not violate Article 24 of the Declaration.

### D. *Separation of Powers*

Appellants argue that the Statute violates Article 8 of the Declaration, which states:

That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

Specifically, appellants point to Section 6–818(b) of the Statute [10] and contends that it "takes away fact finding powers

---

**10.** The relevant Section reads as follows:

(b) *Certified report as proof of compliance.*—A report submitted to the Department under subsection (a) of this section that certifies compliance for an affected property with the risk reduction standard shall

from the jury" and "creates a 'conclusive' presumption that so long as a report is submitted to the Department, there is 'conclusive' proof that the owner has complied with the risk reduction standard." Appellants continue by asserting that "there is no rational connection between the fact proved (the submission of the report) and the fact presumed (proof that the owner is in compliance with the risk reduction standard)." According to appellants, this violates their right to due process.

The Court of Appeals has previously held that "the courts cannot review the wisdom of projects which elected bodies undertake, nor can courts substitute their judgment for the judgment of the people in authority who make the decisions." *City of Bowie v. Bd. of County Comm'rs for Prince George's County*, 260 Md. 116, 122, 271 A.2d 657 (1970). Furthermore, "[t]he court's role in reviewing the constitutionality of a legislative enactment is more fundamental; it is limited to addressing whether the legislative enactment conflicts with the Constitution." *Anheuser–Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (1995) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Accordingly, the Statute does not violate Separation of Powers under Article 8.

As for the presumption created by the Statute, the Court of Appeals and the Supreme Court "have held that under certain circumstances[,] statutes that create *conclusive, irrebuttable* presumptions may violate due process." *Owens v. State*, 352 Md. 663, 673, 724 A.2d 43 (1999) (emphasis added). A "conclusive presumption" is one "that cannot be overcome by any

---

be conclusive proof that the owner is in compliance with the risk reduction standard for the affected property during the period for which the certification is effective, unless there is:

(1) Proof of actual fraud as to that affected property;

(2) Proof that the work performed in the affected property was not performed by or under the supervision of personnel accredited under § 6–1002 of this title; or

(3) Proof that the owner failed to respond to a complaint regarding the affected property as required by § 6–819 of this subtitle.

Envir. § 6–818(b).

additional evidence or argument." BLACK'S LAW DICTIONARY 1223 (8th ed.2004). In this case, the relevant portion of the Statute provides that "[a] report submitted to the Department ... that certifies compliance for an affected property with the risk reduction standard shall be conclusive proof that the owner is in compliance with the risk reduction standard." Envir. § 6–818(b). The report, however, must show that an accredited and independent inspector performed the test for lead-contaminated dust. *See* Envir. § 6–818(a). Thus, any presumption created by the Statute would not arise "out of the thin air" and would, therefore, be valid. *Cf. Mahoney v. Byers,* 187 Md. 81, 88, 48 A.2d 600 (1946) (invalidating a conclusive presumption that stated that a positive drug test of a horse shall be conclusive evidence either that there was knowledge of the fact on the trainer's part or that the trainer was guilty of carelessness).

Section 6–818(b) states that the filed report shall be conclusive proof of compliance *"unless* there is" (1) proof of actual fraud, (2) proof that the inspection was not performed by an accredited worker, or (3) proof that the owner failed to respond to a complaint regarding the property. Envir. § 6–818(b) (emphasis added). Again, evidence of any of those three instances can serve to overcome the presumption created by the statute. As a result, we hold that the presumption is rebuttable and that the Statute is a constitutional exercise of legislative power.

## II. Appellees did not fully comply with the Statute and, thus, are not entitled to qualified immunity.

Appellants next argue that the trial court erred in ruling that appellees complied with the Lead Risk in Housing Act, Section 6–812, which states, in relevant part, that an owner who has registered an affected property shall "[r]enew the registration of the affected property on or before December 31 of each year." Envir. § 6–812(a)(1). Under Section 6–813, an owner who fails to renew registration "is not in compliance with respect to that affected property," for purposes of Section 6–836, protection from liability. Envir. § 6–813(a).

■■ During trial, the parties stipulated that for calendar years 1997, 1998, 1999, and 2000, appellees sent registration renewals to MDE on or before December 31 of those years. At the conclusion of the hearing, the trial judge ruled that a registration renewal is effective upon mailing, instead of upon receipt by MDE. We believe that the trial court erred and hold that registration renewal is complete not when a property owner sends the form, but when the form is actually marked as "received" and date-stamped by MDE.[11]

The trial court interpreted Section 6–812 to require that the registration renewal be mailed prior to December 31. In its view, a property owner could be compliant even if MDE never received a renewal form, so long as the property owner alleged that he mailed said form. In this case, the mailbox rule [12] does not apply.

Previously, the Court of Appeals stated:

> If a statute has more than one reasonable interpretation, it is ambiguous. If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.

---

**11.** The State of Maryland, Department of the Environment filed a Brief of *Amicus Curiae* and noted:

> The renewal forms are mailed to the Department's post office box, which is checked at least one time per day. Mail from the post office box is bundled and marked with the day it was collected. When the Lead Poisoning Prevention Program receives mail, it is date stamped with the date in which it was collected from the post office.

**12.** "Mailbox rule" is the principle that when a document is filed, filing is deemed to have occurred on the date of mailing. Black's Law Dictionary 972 (8th ed.2004).

*Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036 (2006) (citations omitted).[13] Furthermore, this Court has recognized:

> If a specific term is not defined in the statute, the Court will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute. But, we may consider the dictionary definition of a word, although dictionary definitions are not dispositive of legislative intent.

*F.D.R. Srour P'ship v. Montgomery County,* 179 Md.App. 109, 123, 944 A.2d 1149 (2008) (internal citations omitted), *cert. granted,* 405 Md. 290, 950 A.2d 828 (2008).

The word "renew" has been defined as follows:

> To make new again; to restore to freshness; to make new spiritually; to regenerate; to begin again; to recommence; to resume; to restore to existence; to revive; to reestablish; to recreate; to replace ...

BLACK'S LAW DICTIONARY 1460 (4th ed.1951). Meanwhile, renewal has been defined as:

> The act of renewing or reviving. A revival or rehabilitation of an expiring subject; that which is made anew or re-established; in law, meaning an obligation on which time or payment is extended; the substitution of a new right or obligation for another of the same nature, a change of something old to something new ...

---

**13.** The Court of Appeals, in *Blundon v. Taylor,* 364 Md. 1, 11, 770 A.2d 658 (2001), also considered Maryland Rule 1–322(a) as it pertains to the time that a pleading is deemed filed, for court purposes, and stated:

> ... we believe that Rule 1–322 is so clear and unambiguous in this regard that it does not require construction. Section (a) requires that, to be filed, pleadings and papers *must be actually delivered, either in person or by mail,* to the clerk or a judge of the court in which they are sought to be filed.

(Emphasis added). We agree with this interpretation. Although we are not interpreting a rule in this case, the statute at issue still dictates a rule of procedure. Therefore, just as "mailing" is not synonymous with "filing" for purposes of court pleadings, "mail" is not synonymous with "renew" for purposes of the Statute.

*Id.* The latest edition of the dictionary does not define "renew," but adds the following to the definition of "renewal":

The re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract.

BLACK'S LAW DICTIONARY 1322 (8th ed.2004).

In this case, we believe that "renew" means "to revive the registration" and "to recreate the legal relationship that was originally created by the initial registration." In order to "revive" and "re-create," one must look at the scheme for the initial registration of the affected property, as laid out in Section 6–811. The relevant part of that section states that, "[o]n *or before December 31,* 1995, the owner of an affected property shall register the affected property with the Department." Envir. § 6–811(a)(1) (emphasis added). In order to register, the Department must acknowledge receipt of the registration form. Thus, the form must be received on or before December 31, 1995. If "renewal" revives and re-creates the original registration, it then follows that the renewal form, too, must be received by the Department on or before December 31 of each successive year at a minimum. There is no requirement for an acknowledgment but that does not change the requirement for renewal.

Furthermore, we note that there are numerous other sections of the Annotated Code of Maryland in which the Legislature dictates the renewal process for various documents and specifies that it can be done by mail. For example, Md.Code (2004 Repl.Vol.), § 19–404.1(c) of the Business Occupations & Professions Article states:

*Renewal—In general.*—At least 90 days before a certification expires, the applicant shall *mail* to the Secretary:

(1) a renewal application form;

(2) the amount of the renewal fee; and

(3) the amount of any late fee, as determined by the Secretary.

(Emphasis added). Similarly, Md.Code (2006 Repl.Vol.), § 16–115(e) of the Transportation Article states that, "[i]f a

licensee is absent from this State for cause . . . and is unable to renew his license in the manner required by this section, the licensee *may renew by mail* to the Administration." (Emphasis added). Thus, had the Legislature intended to rule that registration renewal is effective upon mailing, instead of upon receipt by MDE, we believe that it would have specified that specific language.

Finally, it is worth noting that MDE, through its Brief of *Amicus Curiae*, has made clear that it interprets the Statute as we do. MDE's interpretation and application of the Statute is entitled to considerable weight by reviewing courts. *See Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376 (1999). "[W]e accord a degree of deference to the position of the administrative agency in our review of the administrative agency's legal conclusion, especially when the statutory language of the statute at hand is ambiguous." *Bowen v. City of Annapolis*, 402 Md. 587, 612–13, 937 A.2d 242 (2007); *see also Singley v. County Comm'rs of Frederick County*, 178 Md.App. 658, 675, 943 A.2d 636 (2008) (holding that this Court reviews the agency's factual decisions in the light most favorable to the agency, with deference to the knowledge and expertise of those people who constitute the agency). For these reasons, we reverse the trial court's decision and hold that the appellees did not fully comply with the Statute. This portion of the decision is prospective only.

### III. The Statute applies to Persons at Risk who have EBL levels below 25 μg/dl.

Appellants assert that the trial court erred in ruling that the Statute applies to claims in which a child's EBL level does not reach 25 μg/dl. In appellants' view, Persons at Risk with EBL levels below those set by Section 6–828(b) (*see supra* n. 5), retain all common law causes of action, regardless of whether the property owner was in compliance with the Statute. We disagree.

This Court has previously held that "[a] statute must be read as a whole, so that all provisions are considered together

and, to the extent possible, reconciled and harmonized." *Bennett v. State Dept. of Assessments and Taxation,* 143 Md.App. 356, 369, 795 A.2d 124 (2001) (citing *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93 (1994) and *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)). Thus, in reading Section 6–828(b), we must consider the applicability of Section 6–827 which states that "[t]his part applies to *all potential bases of liability* for alleged injury or loss to a person caused by the ingestion of lead by a person at risk in an affected property." Envir. § 6–827 (emphasis added). In so doing, we hold that the provisions of Section 6–828(b) do not set threshold EBL levels that trigger the property owners' right to invoke limited liability protection. Instead, these provisions impose an additional obligation on property owners, beyond compliance with the Statute, to make a timely qualified offer to a Person at Risk, who has an EBL level above those specified in Section 6–828(b). Our interpretation is consistent with Section 6–827, which does not refer to any threshold EBL levels as a condition of limited liability.

Our interpretation is also consistent with Legislative intent. According to the Commission Report, one of the primary components of the Commission's proposal was "liability and insurance reforms which define and limit the potential liability of property owners based upon performance of the recommended measures, and when applicable, the making of a 'qualified offer' to the representative of a lead poisoned child." Report of the Lead Paint Poisoning Commission, *supra,* at 7. Thus, the provisions of Section 6–828(b) impose an *additional* obligation on property owners.

Furthermore, nothing in the legislative history indicates any intent by the legislature to allow civil suits by Persons at Risk with EBL levels below those stated in Section 6–828(b). In its Brief of *Amicus Curiae,* MDE notes that this issue (regarding the application of limited liability to claims by Persons at Risk with EBL levels below the threshold levels) was raised during the legislative session. According to the MDE, in an informal advice letter, Kathryn M. Rowe, Assistant Attorney General, opined that Envir. § 6–828(b) bars legal proceedings by Per-

sons at Risk with EBL levels below the levels eligible for a qualified offer. *See* Letter from Kathryn M. Rowe, Assistant Attorney General, to The Honorable Kenneth C. Montague, Jr., Delegate (March 4, 1994). This opinion supports the interpretation that the Legislature intended to subject Persons at Risk with EBL levels below the threshold levels to the Statute's limited liability provisions, if the property was in compliance.

## IV. When a property owner is in full compliance with the Statute, claims under the Consumer Protection Act, against said owner, are barred.

In their complaint, appellants alleged that they were injured by a "deceptive practice," prohibited by the CPA. In granting appellees' motion for summary judgment, the trial court ruled that the Statute provides appellees with immunity from liability under the CPA. Appellants now assert that the court erred and that its decision should be reversed. Again, we disagree.

The CPA, codified at Md.Code (2005 Repl.Vol.), § 13–301 *et seq.* of the Commercial Law Article ("CL"), includes "lessee" as a "consumer." CL § 13–101(c)(1). It also allows a tenant to recover damages, in a private cause of action against a landlord, for injuries caused by "unfair or deceptive trade practice." CL §§ 13–303, 13 –408. Indeed, it is not uncommon for plaintiffs in lead paint poisoning cases to seek damages under the CPA. *See, e.g., Davis v. Goodman,* 117 Md. App. 378 (1997) (tenant brought personal injury claim against two landlords, alleging that he suffered brain injury due to lead paint poisoning during residency in landlords' houses).

Appellants contend that the language of Envir. §§ 6–828, 6–835, and 6–836 reflects the fact that the Statute applies only to actions in tort. Appellants contrast this with the CPA and claims that "a landlord's violation of the CPA is not" in the nature of a tort. Appellants are clearly mistaken, as this Court has previously held "that violations of the Consumer Protection Act are in the nature of a tort action." *MaryCLE,*

*LLC v. First Choice Internet, Inc.,* 166 Md.App. 481, 528, 890 A.2d 818 (2006) (quotations omitted).

Furthermore, in reading Envir. §§ 6–828, 6–835, and 6–836, we again emphasize that the Statute must be read together, as a whole. For example, Section 6–835 provides that acceptance of a qualified offer "discharges and releases all potential liability of the offeror," while Section 6–836 provides that a compliant owner "is not liable, for alleged injury or loss caused by ingestion of lead" to a Person at Risk who rejects the qualified offer. Envir. §§ 6–835, 6–836. Taken together with Envir. §§ 6–827 and 6–828, we believe that the Legislature intended limited liability in its broadest sense.

The Statute's legislative history also supports a broad reading of its liability protection, as the Commission's recommendations to the Legislature proposed that liability protection be afforded "to all potential bases of liability and to all asserted bases of recovery" in lead paint poisoning actions. Report of the Lead Paint Poisoning Commission, *supra,* at App. B–47. Lastly, we note that a broad reading is consistent with the language and objective of the Statute. The limited liability provisions serve as an incentive for property owners who take certain risk reduction measures to comply with the Statute. 82 Op. Att'y Gen. 180 (Md.1997). In turn, their compliance is a benefit to tenants by providing safe, affordable housing. This intended result would be undermined if the limited liability provisions were interpreted to permit actions under the CPA, wherein tenants could seek, essentially, the same relief as they would in a tort action.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID TWO–THIRDS BY APPELLANT, ONE–THIRD BY APPELLEES.**