30 A.3d 854

**Zi'Tashia JACKSON, a minor, et al.**

**v.**

**The DACKMAN COMPANY, et al.**

**No. 131, Sept. Term, 2008.**

Court of Appeals of Maryland.

Oct. 24, 2011.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A., Baltimore, MD; Terry J. Harris of Law Offices of Terry J. Harris, Spokane, WA; Lisa J. Smith of Law Office of Peter T. Nicholl, Baltimore, MD), on brief, for Petitioners/Cross–Respondents.

James R. Benjamin, Jr. (Thomas J. Whiteford of Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), on brief, for Respondents/Cross–Petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS and JOHN C. ELDRIDGE,(Retired, Specially Assigned), JJ.

---

\* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

ELDRIDGE, J.

The principal issues in this case concern the constitutionality of the provisions in the Reduction of Lead Risk in Housing Act which grant to the owners of certain rental properties, under specified conditions, immunity from personal injury suits based upon a child's or a pregnant woman's ingestion of lead. We shall hold that the statute's provisions granting immunity violate Article 19 of the Maryland Declaration of Rights and are, therefore, invalid.

## I.

The Reduction of Lead Risk in Housing Act was enacted by Ch. 114 of the Acts of 1994 and is, for the most part, codified in Maryland Code (1982, 2007 Repl.Vol., 2011 Supp.), subtitle 8, §§ 6–801 through 6–852 of the Environment Article. As stated in § 6–802 of the Act, "[t]he purpose of this subtitle is to reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing." The Act was generally based upon the recommendations of a study commission, the "Lead Paint Poisoning Commission," which reported to the General Assembly in December 1993 and which issued a final report in May 1994.

The Act was divided into several parts, with Part I, consisting of §§ 6–801 through 6–804, containing definitions and coverage provisions. Among the definitions, the phrase "affected property" is primarily defined as "property constructed before 1950 that contains at least one rental dwelling unit" (§ 6–801(b)). Part II of the Act, in §§ 6–807 through 6–810, creates and delineates the duties of an advisory and study commission. Part III is titled "Registration of Affected Property," and it requires that "the owner of an affected property shall register the affected property with the Department [of the Environment]" on "or before December 31, 1995" (§ 6–811(a)). The registration involves filling out a form giving the Department various items of information about the affected property (§ 6–811(b)). The statute also requires that the registration be renewed "on or before December 31 of each

year," updating the information about the affected property (§. 6–812(a)(1)). If an owner first acquires affected property after December 1, 1995, the owner "shall register the affected property . . . within 30 days after the acquisition" (§ 6–812(b)). Section 6–813(a) provides that, if an owner "fails to register" or "fails to renew the registration of an affected property," the owner "is not in compliance with respect to that affected property . . . for purposes of § 6–836," which is one of the sections granting immunity from suit.

Sections 6–815 through 6–824 comprise Part IV of the Act, titled "Risk Reduction Standard for Affected Property." These sections establish detailed and mandatory risk reduction standards for affected property,[1] set forth a schedule for

---

1. Section 6–815 provides in part as follows:

"**§ 6–815. Satisfaction of risk reduction standards; enforcement officer.**

(a) *On first change of occupancy.*—No later than the first change in occupancy in an affected property that occurs on or after February 24, 1996, before the next tenant occupies the property, an owner of an affected property shall initially satisfy the risk reduction standard established under this subtitle by:

(1) Passing the test for lead-contaminated dust under § 6–816 of this subtitle provided that any chipping, peeling, or flaking paint has been removed or repainted on:

(i) The exterior painted surfaces of the residential building in which the rental dwelling unit is located; and

(ii) The interior painted surfaces of the rental dwelling unit; or

(2) Performing the following lead hazard reduction treatments:

(i) A visual review of all exterior and interior painted surfaces;

(ii) The removal and repainting of chipping, peeling, or flaking paint on exterior and interior painted surfaces;

(iii) The repair of any structural defect that is causing the paint to chip, peel, or flake that the owner of the affected property has knowledge of or, with the exercise of reasonable care, should have knowledge of;

(iv) Stripping and repainting, replacing, or encapsulating all interior windowsills with vinyl, metal, or any other material in a manner and under conditions approved by the Department;

(v) Ensure that caps of vinyl, aluminum, or any other material in a manner and under conditions approved by the Department, are installed in all window wells in order to make the window wells smooth and cleanable;

(vi) Except for a treated or replacement window that is free of lead-based paint on its friction surfaces, fixing the top sash of all

bringing affected property into compliance with the risk re-
duction standards, and provide that the owner of affected
property may lose liability protection for non-compliance.[2]

windows in place in order to eliminate the friction caused by
movement of the top sash;

(vii) Rehanging all doors necessary in order to prevent the rubbing
together of a lead-painted surface with another surface;

(viii) Making all bare floors smooth and cleanable;

(ix) Ensure that all kitchen and bathroom floors are overlaid with a
smooth, water-resistant covering; and

(x) HEPA-vacuuming and washing of the interior of the affected
property with high phosphate detergent or its equivalent, as deter-
mined by the Department.

(b) *On each change in occupancy.*—At each change in occupancy
thereafter, before the next tenant occupies the property, the owner of
an affected property shall satisfy the risk reduction standard estab-
lished under this subtitle by:

(1) Passing the test for lead-contaminated dust under § 6–816 of
this subtitle; or

(2)(i) Repeating the lead hazard reduction treatments specified in
subsection (a)(2)(i), (ii), (iii), and (x) of this section; and

(ii) Ensuring that the lead hazard reduction treatments specified in
subsection (a)(2)(iv), (v), (vi), (vii),(viii), and (ix) of this section are
still in effect."

\* \* \*

Section 6–816 states:

"**§ 6–816. Optional lead-contaminated dust testing.**

The Department shall establish procedures and standards for the
optional lead-contaminated dust testing by regulation."

2. Section 6–817 provides in part as follows:

"**§ 6–817. Compliance requirements; loss of liability protection;
cost of temporary relocation.**

(a) *Fifty percent compliance required; loss of liability protection.*—
(1) On and after February 24, 2001, an owner of affected properties
shall ensure that at least 50% of the owner's affected properties have
satisfied the risk reduction standard specified in § 6–815(a) of this
subtitle, without regard to the number of affected properties in which
there has been a change in occupancy.

(2)(i) Notwithstanding any other remedy that may be available, an
owner who fails to meet the requirements of subsections (a)(1) and
(c) of this section shall lose the liability protection under § 6–836 of
this subtitle for any alleged injury or loss caused by the ingestion of
lead by a person at risk that is first documented by a test for EBL
of 20ug/dl [micrograms per deciliter] or more performed between
February 24, 2001 and February 23, 2006, inclusive, of 15 ug/dl or
more performed on or after February 24, 2006, in any of the
owner's units that have not satisfied the risk reduction standard

Section 6–818 provides for inspections of affected property by independent inspectors who are accredited by the Department of the Environment, and § 6–819 contains a "modified risk reduction standard." Section 6–820 requires that owners of affected property give to tenants a "notice of tenant's rights," and § 6–823 requires that the owners give to each tenant a "lead poisoning information packet."

Part V of the Act, titled "Qualified Offer," consists of §§ 6–826 through 6–842. In addition to the provisions concerning "qualified offers," this part contains the limitations on judicial actions.

A "qualified offer" is an offer of money by an owner, the owner's agent, or an insurer of the owner, made to a person at risk or to a parent or legal guardian of a person at risk who is a minor (§§ 6–831 through 6–834). A "person at risk" is defined as "a child or a pregnant woman who resides or regularly spends at least 24 hours per week in an affected property" (§ 6–801(p)). "Child" is defined as "an individual under the age of 6 years" (§ 6–801(d)). A "qualified offer" is

---

specified in § 6–815(a) of this subtitle and the inspection requirement of subsection (c) of this section.

(ii) On or after the date that the owner meets the requirements of subsections (a)(1) and (c) of this section, the liability protection under § 6–836 of this subtitle shall be reinstated for any alleged injury or loss caused by the ingestion of lead by a person at risk that is first documented by a test for EBL of 20 ug/dl or more performed between February 24, 2001 and February 23, 2006, inclusive, or 15 ug/dl or more performed on or after February 24, 2006.

(b) *One-hundred percent compliance; loss of liability protection.*—
(1) On and after February 24, 2006, an owner of affected properties shall ensure that 100% of the owner's affected properties in which a person at risk resides, and of whom the owner has been notified in writing, have satisfied the risk reduction standard specified in § 6–815(a) of this subtitle.

(2)(i) Notwithstanding any other remedy that may be available, an owner who fails to meet the requirements of subsections (b)(1) and (c) of this section, or of § 6–819(e) of this subtitle shall lose the liability protection under § 6–836 of this subtitle for any alleged

designed to cover some expenses which are incurred on behalf of an affected person at risk.[3] Nevertheless, the maximum

---

> injury or loss caused by the ingestion of lead by a person at risk...."

> * * *

**3.** Section 6–839 of the Act provides as follows:

"**§ 6–839. Expenses and costs included in qualified offer; certification of compliance; regulations.**

(a) *Reasonable expenses and costs.*—Whenever a qualified offer is made under this part, the qualified offer shall include payment for reasonable expenses and costs up to the amount specified in § 6–840 of this subtitle for:

(1) The relocation of the household of the person at risk to lead-safe housing of comparable size and quality that may provide:

(i) The permanent relocation of the household of the affected person at risk to lead-safe housing, including relocation expenses, a rent subsidy, and incidental expenses; or

(ii) The temporary relocation of the household of the affected person at risk to lead-safe housing while necessary lead hazard reduction treatments are being performed in the affected property to make that affected property lead-safe; and

(2) Medically necessary treatment for the affected person at risk as determined by the treating physician or other health care provider or case manager of the person at risk that is necessary to mitigate the effects of lead poisoning, as defined by the Department by regulation, and, in the case of a child, until the child reaches the age of 18 years.

(b) *Reasonable medical expenses.*—An offeror is required to pay reasonable expenses for the medically necessary treatments under subsection (a)(2) of this section if coverage for these treatments is not otherwise provided by the Maryland Medical Assistance Program under Title 15, Subtitle 1 of the Health–General Article or by a third-party health insurance plan under which the person at risk has coverage or in which the person at risk is enrolled.

(c) *Certification of compliance.*—A qualified offer shall include a certification by the owner of the affected property, under the penalties of perjury, that the owner has complied with the applicable provisions of Parts III and IV of this subtitle in a manner that qualifies the owner to make a qualified offer under this part.

(d) *Regulations.*—The Department may adopt regulations that are necessary to carry out the provisions of this section."

Section 6–841 states as follows:

"**§ 6–841. Payments under qualified offer for temporary relocation; reoccupation of affected property.**

(a) *In general.*—Payments under a qualified offer for temporary relocation shall include:

(1) Transportation expenses;

(2) The rent or per diem cost of temporary lead-safe housing;

amount payable under a qualified offer is only $17,000, and most of this is payable to the provider of medical or other services and not to the person at risk.[4]

The Act, in § 6–835, provides that "[a]cceptance of a qualified offer by a person at risk, or by a parent [or] legal guardian" of a person at risk, "releases all potential liability of the offeror, the offeror's insured or principal."[5] Section 6–

---

(3) Meal expenses, if the temporary lead-safe housing does not contain meal preparation facilities; and

(4) The cost of moving, hauling, or storing furniture or other personal belongings.

(b) *Reoccupation of affected property prohibited.*—The household of the person at risk may not reoccupy the affected property until the property has been certified as lead-safe."

4. Section 6–840 sets forth the maximum amounts payable under a qualified offer as follows:

"**§ 6–840. Aggregate maximum amounts payable; payment; payments not income or asset.**

(a) *Aggregate maximum amounts payable.*—The amounts payable under a qualified offer made under this part are subject to the following aggregate maximum caps:

(1) $7,500 for all medically necessary treatments as provided and limited in § 6–839(a) and (b) of this subtitle; and

(2) $9,500 for relocation benefits which shall include:

(i) Relocation expenses;

(ii) A rent subsidy, up to 150% of the existing rent each month, for the period until the person at risk reaches the age of 6 years, or in the case of a pregnant woman, until the child born as a result of that pregnancy reaches the age of 6 years; and

(iii) Incidental expenses which may be incurred by the household, such as transportation and child care expenses.

(b) *Expenses to be paid to provider; exceptions.*—All payments under a qualified offer specified in subsection (a) of this section shall be paid to the provider of the service, except that payment of incidental expenses as provided by subsection (a)(2)(iii) of this section may be paid directly to the person at risk, or in the case of a child, to the parent or legal guardian of the person at risk.

(c) *Payments not income or asset.*—The payments under a qualified offer may not be considered income or an asset of the person at risk, the parent of a person at risk who is a child, the legal guardian, or a person who accepts the offer on behalf of a person at risk who is a child under § 6–833 of this subtitle for the purposes of determining eligibility for any State entitlement program."

5. Section 6–835 states:

"**§ 6–835. Release of liability on acceptance.**

836, on the other hand, provides that if a qualified offer is rejected, "[a]n owner of an affected property is not liable, for alleged injury or loss caused by ingestion of lead by a person at risk in the affected property." [6] Section 6–836.1 purports to direct a trial court to proceed in a particular manner if an owner's claim of immunity from liability under §§ 6–835 or 6–836 is challenged by any party.[7]

---

Acceptance of a qualified offer by a person at risk, or by a parent, legal guardian, or other person authorized under § 6–833 of this subtitle to respond on behalf of a person discharges and releases all potential liability of the offeror, the offeror's insured or principal, and any participating co-offeror to the person at risk and to the parent or legal guardian of the person at risk for alleged injury or loss caused by the ingestion of lead by the person at risk in the affected property."

6. Section 6–836 provides as follows:

"**§ 6–836. Protection from liability; regulatory compliance.**
An owner of an affected property is not liable, for alleged injury or loss caused by ingestion of lead by a person at risk in the affected property, to a person at risk or a parent, legal guardian, or other person authorized under § 6–833 of this subtitle to respond on behalf of a person at risk who rejects a qualified offer made by the owner or the owner's insurer or agent if, during the period of the alleged ingestion of lead by the person at risk, and with respect to the affected property in which the exposure allegedly occurred, the owner:
(1) Has given to the tenant the notices required by §§ 6–820 and 6–823 of this subtitle; and
(2) Was in compliance with:
(i) The registration provisions of Part III of this subtitle; and
(ii) The applicable risk reduction standard and response standard under § 6–815 or § 6–819 of this subtitle, and the risk reduction schedule under § 6–817 of this subtitle."

7. Section 6–836.1 reads as follows:

"**Section 6–836.1. Protection from liability; regulatory compliance—Discovery and evidentiary hearing.**
In an action in which the owner's immunity from liability under § 6–835 or § 6–836 of this subtitle is challenged, upon motion by any party and prior to authorizing further proceedings in the action, the court shall:
(1) Allow discovery limited solely to the issue of the owner's immunity under § 6–835 or § 6–836 of this subtitle;
(2) Determine if there are any disputes of material fact as to whether the owner is entitled to immunity under § 6–835 or § 6–836 of this subtitle;

Although certain sections of the Act are written as if §§ 6–835 and 6–836 were the only provisions granting immunity to the owners (*see, e.g.*, §§ 6–813(a) or 6–836.1), §§ 6–827 and 6–828 also deal with liability and immunity from personal injury suits. Section 6–827 indicates that Part V of the statute, relating to qualified offers and owners' immunity from suit, is intended to be very broad. Section 6–827 states:

"§ 6–827. **Applicability.**

This part applies to all potential bases of liability for alleged injury or loss to a person caused by the ingestion of lead by a person at risk in an affected property."

Section 6–828 appears to grant immunity from personal injury suits to an owner, if that owner has complied with the statute, unless certain notice is given to the owner and the owner has been given the opportunity to make a qualified offer. Section 6–828 provides as follows:

"§ 6–828. **Failure to give notice to owner in compliance.**

(a) *Applicability.*—This section applies to an owner of an affected property who has, with respect to the affected property, complied with the applicable requirements of §§ 6–811, 6–812, 6–815, 6–817, and 6–819 of this subtitle, and has sent to the tenant the notices required by §§ 6–820 and 6–823 of this subtitle.

(b) *In general.*—A person may not bring an action against an owner of an affected property for damages arising from alleged injury or loss to a person at risk caused by the ingestion of lead by a person at risk that is first documented by a test for EBL of 25 ug/dl [micrograms per deciliter] or more performed between February 24, 1996 and February 23, 2001, inclusive, or 20 ug/dl or more performed between February 24, 2001 and February 23,

---

(3) Hold an evidentiary hearing on issues of material fact as to the immunity, if any, which shall, upon request of any party, be before a jury; and

(4) Determine as a matter of law whether the owner is entitled to immunity from liability under § 6–835 or § 6–836 of this subtitle."

2006, inclusive, or 15 ug/dl or more performed on or after February 24, 2006, unless the owner has been given:

(1) Written notice from any person that the elevated blood level of a person at risk is:

(i) Greater than or equal to 25 ug/dl as first documented by a test for EBL performed between February 24, 1996 and February 23, 2001, inclusive;

(ii) Between February 24, 2001 and February 23, 2006, inclusive, an EBL greater than or equal to 20 ug/dl as first documented by a test for EBL performed between February 24, 2001 and February 23, 2006, inclusive; or

(iii) On or after February 24, 2006, an EBL greater than or equal to 15 ug/dl as first documented by a test for EBL performed on or after February 24, 2006; and

(2) An opportunity to make a qualified offer under § 6–831 of this subtitle." [8]

---

**8.** The bill, which became Ch. 114 of the Acts of 1994, which is the Reduction of Lead Risk in Housing Act, was House Bill 760. While this bill was pending in the General Assembly during its 1994 Session, a member of the House of Delegates requested the advice of the Attorney General's Office as to "whether the bill creates absolute immunity from suit ... if the child's blood level is below" the micrograms per deciliter figures set forth in § 6–828. The Attorney General's "Office of Counsel to the General Assembly" responded by a letter dated March 4, 1994, taking the position that, if the owner is in compliance with the statute and "receives notice that a child has [an] elevated blood level," and if "the owner ... makes a qualified offer," the owner would have immunity from suit whether the qualified offer is accepted or rejected. The Attorney General's Office specifically relied upon the broad language of § 6–827.

The Committee Report of the House Environmental Matters Committee on House Bill 760 of the 1994 legislative session, contained in the file of the then Department of Legislative Reference, stated that the "liability of a property owner who complies with the bill is limited to a qualified offer." The Report also pointed out that the maximum liability under a qualified offer is $17,000. The "Floor Report" of the Senate Judicial Proceedings Committee on House Bill 760 similarly stated that the "liability of a property owner who complies with the bill is limited to a qualified offer."

In light of our holding in this case with regard to the immunity provisions, we need not further explore this coverage issue.

**370**

## II.

▮ As the present case was resolved in the Circuit Court by a grant of the defendants' motion for summary judgment, " 'we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs.' " *Bednar v. Provident*, 402 Md. 532, 542, 937 A.2d 210, 215 (2007), quoting *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 728 (2001). *See, e.g., Reiter v. Pneumo Abex*, 417 Md. 57, 67, 8 A.3d 725, 731 (2010) (" 'We review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant' "); *LaBelle v. Old Europe*, 406 Md. 194, 208, 958 A.2d 269, 277 (2008); *Anderson v. The Gables*, 404 Md. 560, 570, 948 A.2d 11, 18 (2008); *Lee v. Cline*, 384 Md. 245, 248, 863 A.2d 297, 299 (2004).

This case began in July 2002 when ZiTashia Jackson and her mother, Tameka Jackson, filed in the Circuit Court for Baltimore City a complaint against the Dackman Co., Jacob Dackman & Sons, L.L.C., Elliot Dackman, and Charles A. Skirven, Trustee.[9] The case involved two separate pieces of residential, rental property in Baltimore City, one of which was 1233 Cliftview Avenue and the other was 706 Mt. Holly Street. The complaint alleged that both properties were owned, controlled, managed, supervised or maintained by the defendants. The plaintiffs sought damages based on ZiTashia's claimed severe and permanent brain injuries allegedly resulting from her ingestion of lead-based paint at 1233 Cliftview Avenue and 706 Mt. Holly Street. The complaint sounded in negligence as well as alleged deceptive practices in violation of the Maryland Consumer Protection Act, Maryland Code (1975, 2005 Repl.Vol.), Title 13 of the Commercial Law Article.

---

9. In the record and briefs, the plaintiff child's name is sometimes spelled "ZiTashia," sometimes spelled "ZiTaschia," sometimes spelled Z'Tashia, and sometimes spelled "Zt'Tashia." Similarly, her mother's name is sometimes spelled "Tameka" and sometimes spelled "Tamekia." We shall use the spellings "ZiTashia" and "Tameka."

ZiTashia Jackson was born on January 12, 1997, and, when she was one year old, ZiTashia and her mother moved to 1233 Cliftview Avenue. The Cliftview Avenue property was actually rented from the defendants by two of Tameka's maternal aunts, although the lease listed ZiTashia as one of the children residing at the property. When her aunts executed the lease for the Cliftview property, they did not note on the lease any defective conditions such as chipping, flaking or peeling paint. Nevertheless, ZiTashia's mother, Tameka Jackson, in an affidavit filed in the Circuit Court, stated that, when she and her daughter first moved to the Cliftview property to live with her aunts, there was chipping and flaking paint on both the wooden exterior window frames and on the wooden interior window frames. Tameka further said that "[t]here was also chipping and flaking paint on the floors and, every time I swept, the paint would come off." She stated that, "[w]hen we lived at Cliftview Ave., my daughter had a lot of hand to mouth activity, and she put everything in her mouth." The affidavit also represented that Tameka "witnessed my aunt . . . call the landlord to complain about chipping paint . . . [but the] landlord never repaired the chipping paint while we lived at 1233 Cliftview Ave."

Prior to the plaintiffs' move to 1233 Cliftview Avenue, the defendants filed a certificate with the Maryland Department of the Environment which asserted that the Cliftview Property received a "Full Risk Reduction" on February 19, 1997. Moreover, the tenants stated that, before moving into the Cliftview Avenue property, the defendants represented to the tenants that the premises were lead free. Nonetheless, while residing at the house on Cliftview Avenue, ZiTashia was lead-poisoned. She had a blood lead level of 21 ug/dl on October 22, 1998, 16 ug/dl on November 18, 1998, 15 ug/dl on February 5, 1999, and 9 ug/dl on January 21, 2000. For the years at issue in this case (1997, 1998, 1999 and 2000), ZiTashia's blood-lead level never reached 25 ug/dl, which is the level set forth in § 6–828(b) applicable to those years.

On January 29, 1999, Tameka Jackson and ZiTashia's father, Dia Lawrence, signed a lease for a month-to-month

tenancy at 706 Mt. Holly Street. Tameka and ZiTashia Jackson moved from the Cliftview Avenue property to 706 Mt. Holly Street on February 1, 1999. Earlier, on January 8, 1999, the Mt. Holly property had received a "Full Risk Reduction" and inspection, and the inspector determined that the property complied with the standards required under the Reduction of Lead Risk in Housing Act. Also, before executing the lease for the Mt. Holly property, Tameka Jackson and Dia Lawrence were required to inspect the property and write down any defective conditions. They did not note on the lease that there was chipping, flaking or peeling paint, although they did list ZiTashia as a child residing at the property.

Tameka Jackson, by affidavit, represented that the Mt. Holly Street residence had "chipping paint around all of the windows, on my daughter's room walls and windowsills and in the playroom." She also stated that, before she signed the lease, the defendants' rental agent told Tameka that "706 Mt. Holly Street was lead free." Tameka further said in the affidavit that, while residing at Mt. Holly Street, she saw ZiTashia "put paint chips in her mouth." Tameka stated:

> "I called the rental office and complained about the paint about a month after I moved to 706 Mt. Holly St. I told the woman who answered the phone that there was chipping and flaking paint on the wall and windows and that my daughter was picking at it. She said they would send someone out, but no one ever came to fix the chipping and flaking paint."

Turning to the matter of the defendant's compliance with the Reduction of Lead Risk in Housing Act, the only issue that has been raised in this case concerns Part III, §§ 6–811 through 6–813, which is the requirement that affected property be registered and that the registration be renewed and updated "on or before December 31 of each year" (§ 6–812(a)(1)). There was in this case a dispute over the basic facts regarding the registrations of both rental properties involved. Because of this dispute, the Circuit Court denied in part the defendants' motions for summary judgment. Thereafter, the parties entered a stipulation of the facts concerning

registration. It was stipulated that, for the years in question, the registration renewals were mailed by the defendants on or before December 31 of each year but were received by the Department of the Environment at various dates during the following Januarys.

In the Circuit Court, in support of their motions for summary judgment, the defendants contended, *inter alia,* that they had complied with the Reduction of Lead Risk in Housing Act, and, therefore, they were immune from suit under the immunity provisions of the Act. With respect to a qualified offer, the defendants pointed out that they did not receive written notice of ZiTashia's elevated blood lead level as required by the Act, and thus they had no opportunity to make a qualified offer.

The plaintiffs, in opposing summary judgment, argued in the Circuit Court that the Act's grant of immunity was unconstitutional on several grounds. They claimed that the immunity provisions of the Act violated their rights to equal protection of the laws and due process of law guaranteed by the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights, that the immunity provisions deprived them of their right to jury trial in violation of the Seventh Amendment [10] and Articles 5 and 23 of the Maryland Declaration of Rights, that the grant of immunity from suit was inconsistent with the separation of powers requirement in Article 8 of the Declaration of Rights, and that the immunity sections were in violation of Article 19 of the Declaration of Rights. The plaintiffs also asserted that the defendants had not complied with the registration requirements of the Act, as the annual renewals of registration for the years in question were not received by the Department of the Environment by

---

10. It is settled that the Seventh Amendment has no application to state court proceedings. *See, e.g., Consumer Protection v. Morgan,* 387 Md. 125, 189, 874 A.2d 919, 956 (2005); *Maryland Aggregates v. State,* 337 Md. 658, 681 n. 14, 655 A.2d 886, 897 n. 14, *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Bringe v. Collins,* 274 Md. 338, 341–345, 335 A.2d 670, 673–675, *application for stay denied,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 475 (1975).

December 31 of each year but were received in January of the next year. Finally, the plaintiffs argued that the immunity provisions of the Act were inapplicable if a child's blood lead level was below the amounts set forth in § 6–828. *See* footnote 8 *supra.*

The Circuit Court granted in part the defendants' motion for summary judgment and filed an opinion holding that the immunity provisions of the Act were constitutional and were applicable "for all" blood lead levels. As previously mentioned, because there was a dispute over the basic facts concerning the defendants' renewals of registration, the court only granted in part the motion for summary judgment. Later, after the parties entered a stipulation of the facts relating to the registration renewals, the Circuit Court granted in full the defendants' motion for summary judgment. The court held that the registration renewals were timely because they were mailed on December 31 of each year. The brief final judgment order stated "that judgment is entered in favor of the Defendants as to all counts."

The plaintiffs appealed to the Court of Special Appeals, making the same arguments that had been advanced in the Circuit Court. The intermediate appellate court initially rendered an unreported opinion disposing of the case, but, upon a request from one of the parties, decided to report the opinion. *Jackson v. Dackman,* 181 Md.App. 546, 956 A.2d 861 (2008). The Court of Special Appeals agreed with the Circuit Court on the constitutional issues and on the application of the immunity provisions to a child whose elevated blood lead level was below the amounts specified in § 6–828. Nevertheless, the Court of Special Appeals held that the defendants "did not fully comply with the Statute and, thus, are not entitled to qualified immunity." *Jackson v. Dackman, supra,* 181 Md. App. at 577, 956 A.2d at 879. The appellate court held that, under the statute, the annual renewals of registration had to be *received* by the Department of Environment on or before December 31 of each year. The Court of Special Appeals concluded (181 Md.App. at 581, 956 A.2d at 882): "we reverse

the trial court's decision and hold that the appellees did not fully comply with the Statute." [11]

The plaintiffs filed in this Court a petition for a writ of certiorari, raising the same issues which they raised in the Circuit Court and Court of Special Appeals. The plaintiffs' principal argument, however, was that the Act's immunity provisions violate Article 19 of the Declaration of Rights. In addition, the plaintiffs' petition claimed that the Court of Special Appeals erred by inserting into its opinion the "prospective only" language. The defendants filed a cross-petition for a writ of certiorari, challenging the Court of Special Appeals' interpretation of the registration renewal provision. This Court granted both the petition and the cross-petition.

---

**11.** Immediately after the sentence quoted above in the text, the Court of Special Appeals, in the reported version of its opinion, but not in the earlier unreported version, said: "This portion of the decision is prospective only." *Ibid.* What the Court of Special Appeals meant by this statement is not at all clear. At any rate, the Court of Special Appeals' decision regarding compliance with the statute, even if we were to uphold it, is not the type of decision which, under Maryland law, would be prospective only. The Court of Special Appeals' interpretation of the registration provisions in the Reduction of Lead Risk in Housing Act "was not novel and did not overrule any prior decisions...." *Walker v. State,* 343 Md. 629, 638, 684 A.2d 429, 433 (1996). Thus, "no question regarding a 'prospective only' application ... was presented." *Walker,* 343 Md. at 640, 684 A.2d at 433. *See, e.g., Houghton v. County Com'rs of Kent Co.,* 307 Md. 216, 220, 513 A.2d 291, 293 (1986) (Where a judicial decision does not "overrule[ ] prior law and declare [ ] a new principle of law ... [it] applies retroactively in the same manner as most court decisions"); *Potts v. State,* 300 Md. 567, 576–581, 479 A.2d 1335, 1340–1343 (1984). *See also State v. Daughtry,* 419 Md. 35, 77–81, 18 A.3d 60, 85–87 (2011); *Polakoff v. Turner,* 385 Md. 467, 488–489, 869 A.2d 837, 849–850 (2005).

Another aspect of the Court of Special Appeals' decision is unclear. In its opinion, the intermediate appellate court stated that it was reversing the Circuit Court's decision, but the judgment of the Court of Special Appeals was: "Judgment [of the Circuit Court] Affirmed in Part, Reversed in Part...." What portion of the Circuit Court's "judgment," as distinguished from the Circuit Court's earlier opinion, was being "affirmed" is puzzling. This action was not a declaratory judgment action where an appellate court may affirm some declarations in the judgment and reverse others. As previously set forth, the Circuit Court's judgment was simply "that judgment is entered in favor of the Defendants as to all counts."

As stated at the beginning of this opinion, we shall hold that the immunity provisions in the Act are invalid under Article 19 of the Maryland Declaration of Rights. Consequently, we need not and shall not reach the other issues dealt with by the parties.

### III.

Article 19 of the Maryland Declaration of Rights provides:

**"Article 19. Remedy for injury to person or property.**

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

This Court reviewed some of the history of Article 19 in *Piselli v. 75th Street Medical,* 371 Md. 188, 204–205, 808 A.2d 508, 517–518 (2002), as follows:

"Article 19 was part of the original Maryland Declaration of Rights adopted in 1776, although it was then designated as Article 17 of the Declaration of Rights. Except for one word, the wording today is identical to the 1776 wording.[5] All of the original state constitutions adopted at the time of the Revolutionary War, except Virginia's and North Carolina's, contained provisions like Article 19. While the United States Constitution contains no comparable provision, today the constitutions of 39 states have clauses similar to Article 19. These provisions, often referred to as 'Remedy Clauses' or 'Open Courts Clauses' or 'Access to Courts Clauses,' are based on Chapter 40 of the Magna Carta or, more particularly, Lord Coke's interpretation of Chapter 40.[6] For a review of the history, purpose, interpretation, and application of such clauses, *see, e.g., Smothers v. Gresham Transfer, Inc.,* 332 Or. 83, 23 P.3d 333 (2001); Comment, *The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy,* 47 Kan. L.Rev. 655 (1999); Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions,* 74 Or.

L.Rev. 1279 (1995); Schuman, *The Right To A Remedy,* 65 Temp. L.Rev. 1197 (1992); Schuman, *Oregon's Remedy Guarantee,* 65 Or. L.Rev. 35 (1986); Linde, *First Things First: Rediscovering The States' Bills of Rights,* 9 U. Balt. L.Rev. 379, 385 (1980); Perry and Cooper, *Sources of Our Liberties* 341–351 (rev. ed. 1990); Stringham, *Magna Carta Fountainhead of Freedom* 54–57 (1966); Thorne, Dunham, Kurland, and Jennings, *The Great Charter* 52–61 (1965); Thompson, *Magna Carta* 97–99, 364–365 (1948). *See also* Everstine, *The General Assembly of Maryland 1634–1776* at 566 (1980).

5. "Today's language refers to 'every man,' whereas the 1776 language referred to 'every freeman.' In light of the Equal Rights Amendment [to the Maryland Constitution], which is Article 46 of the Declaration of Rights, adopted in 1972, the provision should be read as 'every person.'

6. "Article 24 of the Maryland Declaration of Rights, which also contains the phrase 'Law of the land,' is based upon Chapter 39 of the Magna Carta."

Article 19 "generally protects two interrelated rights: (1) a right to a remedy for an injury to one's person or property; (2) a right of access to the courts." *Piselli v. 75th Street Medical, supra,* 371 Md. at 205, 808 A.2d at 518. We continued in *Piselli* to set forth some of the specific applications of Article 19 (371 Md. at 205–206, 808 A.2d at 518, footnote omitted):

"We have held that '[i]t is a "basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong." ' *Dua v. Comcast Cable, supra,* 370 Md. [604] at 644, 805 A.2d [1061] at 1061 [ (2002) ], quoting *Ashton v. Brown,* 339 Md. 70, 105, 660 A.2d 447, 464–465 (1995). *See, e.g., Robinson v. Bunch,* 367 Md. 432, 444, 788 A.2d 636, 644 (2002); *Doe v. Doe, supra,* 358 Md. at 128, 747 A.2d at 624; *Clea v. City of Baltimore,* 312 Md. 662, 680–681, 541 A.2d 1303, 1312 (1988); *Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263 (1909). Where a person clearly has a right to money or property under a statute or common law principle, and no statute specifically provides for a remedy, Article 19 guarantees a common law

remedy to enforce the right. *Robinson v. Bunch, supra,* 367 Md. at 444, 788 A.2d at 644. The principle that one has a Maryland constitutional right to judicial review of adjudicatory administrative decisions is based, in part, upon Article 19. *State v. Board of Education, supra,* 346 Md. [633] at 647, 697 A.2d [1334] at 1341 [ (1997) ]. *See Board of License Comm. v. Corridor,* 361 Md. 403, 415, 761 A.2d 916, 922 (2000). Article 19 ordinarily precludes retrospective legislation abrogating accrued causes of action. *Dua v. Comcast Cable, supra,* 370 Md. at 645, 805 A.2d at 1085.

"Apart from these types of specific holdings with respect to Article 19, the constitutional provision generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts. *Johnson v. Maryland State Police,* 331 Md. 285, 297, 628 A.2d 162, 168 (1993). . . . "

Many restrictions upon judicial remedies, challenged under Article 19, have been upheld by this Court, while others have been invalidated. Thus, the application of traditional or well-established immunities from suit has been held not to violate Article 19. *See, e.g., Rios v. Montgomery County,* 386 Md. 104, 139 n. 17, 872 A.2d 1, 21 n. 17 (2005) (immunity of local governments from tort actions based upon "governmental" functions); *Renko v. McLean,* 346 Md. 464, 484, 697 A.2d 468, 478 (1997) (parent-child immunity); *Johnson v. Maryland State Police,* 331 Md. 285, 297, 628 A.2d 162, 168 (1993) (State sovereign immunity).

 Article 19, however, "precludes the Legislature from immunizing from suit both the government and the governmental official involved . . . when the cause of action is based upon a violation of state constitutional rights." *Piselli,* 371 Md. at 207, 808 A.2d at 519. *See Lee v. Cline, supra,* 384 Md. at 262–264, 863 A.2d at 307–308; *DiPino v. Davis,* 354 Md. 18, 50–51, 729 A.2d 354, 371–372 (1999); *Ashton v. Brown,* 339 Md. 70, 105–106, 660 A.2d 447, 464–465 (1995); *Ritchie v.*

*Donnelly,* 324 Md. 344, 370–375, 597 A.2d 432, 445–447 (1991); *Clea v. City of Baltimore,* 312 Md. 662, 680–681, 541 A.2d 1303, 1312 (1988); *Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263 (1909). Moreover, with regard to actions not based upon a violation of constitutional rights, Article 19 may, under some circumstances, preclude immunizing from suit both the government and the government employee involved. *See Lee v. Cline, supra,* 384 Md. at 261–262, 266 n. 4, 863 A.2d at 307–308, 310 n. 4.

This Court has held that Article 19 ordinarily does not prohibit the Legislature from imposing certain conditions precedent before bringing suit. *Rios v. Montgomery County, supra,* 386 Md. at 136–139, 872 A.2d at 20–21 (upholding the 180–day notice provision in the Local Government Tort Claims Act, Maryland Code (1974, 2006 Repl.Vol., 2011 Supp.), § 5–304 of the Courts and Judicial Proceedings Article); *Attorney General v. Johnson,* 282 Md. 274, 298–299, 385 A.2d 57, 71, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60–61, 58 L.Ed.2d 97 (1978) (requiring an arbitration proceeding prior to filing in court a medical malpractice suit). We have taken the position that Article 19 permits the Legislature to impose a reasonable limit upon non-economic damages recoverable in tort cases. *Murphy v. Edmonds,* 325 Md. 342, 366, 601 A.2d 102, 114 (1992). We have also held "that Article 19 does not require the recognition of a new tort cause of action which has never previously been recognized in Maryland." *Piselli,* 371 Md. at 206, 808 A.2d at 519; *Doe v. Doe,* 358 Md. 113, 128, 747 A.2d 617, 625 (2000).

The Court has decided that 5, 10, and 20–year statutes of repose, for certain tort actions, "are not unreasonable restrictions upon remedies and access to the courts, and thus do not violate Article 19, under circumstances where the injured claimants were adults." *Piselli,* 371 Md. at 207–208, 808 A.2d at 519 (emphasis deleted). *See Hill v. Fitzgerald,* 304 Md. 689, 703–705, 501 A.2d 27, 34–35 (1985); *Whiting–Turner Contracting Co. v. Coupard,* 304 Md. 340, 359–360, 499 A.2d 178, 188–189 (1985). On the other hand, in the *Piselli* case, 371 Md. at 216, 808 A.2d at 524, we held that a statute of repose, running

against a minor child during his or her period of minority, and "barring an injured child's medical malpractice claim before the child is able to bring an action is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights."

In addition, as this Court pointed out in *Robinson v. Bunch*, 367 Md. 432, 446–447, 788 A.2d 636, 645 (2002), "the Legislature may *ordinarily* substitute a statutory remedy ... for a common law remedy without violating Article 19 of the Declaration of Rights or other Maryland constitutional provisions." (Emphasis added). *See also Lee v. Cline, supra*, 384 Md. at 265–266, 863 A.2d at 309–310; *Ashton v. Brown, supra*, 339 Md. at 104–108, 660 A.2d at 464–466; *Maryland Aggregates v. State*, 337 Md. 658, 675–682, 655 A.2d 886, 895–898, *cert. denied*, 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Johnson v. Maryland State Police, supra*, 331 Md. at 297 n. 8, 628 A.2d at 168 n. 8; *Ritchie v. Donnelly, supra*, 324 Md. at 374 n. 14, 597 A.2d at 446 n. 14; *Branch v. Indemnity Ins. Co.*, 156 Md. 482, 144 A. 696 (1929); *Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 101 A. 710 (1917). The issue, under our Article 19 jurisprudence, generally is whether the abolition of the common law remedy and substitution of a statutory remedy was reasonable.

The personal injury action filed in the present case, based upon the defendants' alleged violation of a duty under a statute or ordinance " 'designed to protect a specific class of persons which includes the plaintiff,' " has long been recognized under "well-settled Maryland common law...." *Polakoff v. Turner*, 385 Md. 467, 472, 489, 869 A.2d 837, 840, 851 (2005). *See Brooks v. Lewin Realty*, 378 Md. 70, 78, 835 A.2d 616, 620–621 (2003). It is the type of remedy protected by Article 19. Thus, any restriction upon that remedy must be reasonable.

Preliminarily, it should be noted that the immunity granted to defendants by §§ 6–828, 6–835, 6–836, and 6–836.1 of the Act is not, in any respect, a traditional or well-established

immunity from personal injury actions. Instead, the immunity given by the Act to defendants in actions based on permanent brain injuries to children, allegedly caused by the defendants' negligence, did not exist prior to 1994 when the Act was first enacted. Consequently, the Article 19 holdings in *Rios v. Montgomery County, supra,* 386 Md. 104, 872 A.2d 1, *Renko v. McLean, supra,* 346 Md. 464, 697 A.2d 468, and *Johnson v. Maryland State Police, supra,* 331 Md. 285, 628 A.2d 162, do not support the grant of immunity in the present case.

In holding that the immunity granted by the Act did not violate Article 19, the Court of Special Appeals relied on the principle (*Jackson v. Dackman, supra,* 181 Md.App. at 568, 956 A.2d at 874)

> "that 'the Legislature may ordinarily substitute a statutory remedy ... for a common law remedy without violating Article 19 of the Declaration of Rights.' *Robinson v. Bunch,* 367 Md. 432, 446–47, 788 A.2d 636 (2002)."

Unlike the substituted remedy in the *Robinson* case, however, the substituted remedy under the Reduction of Lead Risk in Housing Act for a permanently brain damaged child is totally inadequate and unreasonable.

The only remedy provided by the Act, in substitution for a personal injury action, is a qualified offer by the owners which is accepted by a "person at risk, or a parent or legal guardian of a minor who is a person at risk," (§ 6–834). In the instant case, however, no qualified offer was made and, presumably, was not required to be made. Where no qualified offer is made, the plaintiffs have no remedy under the statute.

Where a qualified offer is made, the maximum amount payable under the offer is $17,000, consisting of "$7,500 for all medically necessary treatments" and "$9,500 for relocation benefits," (§ 6–840(a)(1) and (2)). "Relocation benefits" include "(i) Relocation expenses; (ii) A rent subsidy ...; and (iii) Incidental expenses which may be incurred by the household, such as transportation and child care expenses." § 6–840(a)(2). Moreover, § 6–840(b) provides that "[a]ll payments under a qualified offer ... shall be paid to the provider of the

service, except that payment of incidental expenses . . . may be paid directly to the person at risk, or in the case of a child, to the parent or the legal guardian. . . ."

For a child who is found to be permanently brain damaged from ingesting lead paint, proximately caused by the landlord's negligence, the maximum amount of compensation under a qualified offer is minuscule. It is almost no compensation. Thus, the remedy which the Act substitutes for a traditional personal injury action results in either no compensation (where no qualified offer is made or where a qualified offer is rejected) or drastically inadequate compensation (where such qualified offer is made and accepted).

The Act has no exception to the owner's immunity in the situation where an injured child reaches the age of majority and attempts to bring, in his or her own name, a personal injury action against the owner. On the contrary, § 6–827 of the Act broadly states that the immunity "applies to all potential bases of liability for alleged injury or loss to a person caused by the ingestion of lead by a person at risk in an affected property." Consequently, this case is somewhat analogous to *Piselli*, 371 Md. at 216, 808 A.2d at 524, involving a statute of repose which ran against a minor child during the period of minority and thus barred a medical malpractice action by the child when he or she reached the age of majority. We held that "barring an injured child's medical malpractice claim before the child is able to bring an action is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights." *Piselli*, 371 Md. at 216, 808 A.2d at 524.

A grant of immunity and a statute of repose are, of course, different. Nevertheless, when no adequate remedy is substituted for the grant of immunity, both the statute of repose in *Piselli* and the grant of immunity in the present case leave a negligently injured child without a remedy. What was said in *Piselli*, 371 Md. at 216, 808 A.2d at 524, quoting *Johns Hopkins Hospital v. Pepper*, 346 Md. 679, 695, 697 A.2d 1358, 1366 (1997), is also applicable here: " 'We cannot countenance

a result that would leave the only innocent victim ... uncompensated for his or her injuries....' "

We hold, therefore, that the immunity provisions of the Reduction of Lead Risk in Housing Act are invalid under Article 19 of the Maryland Declaration of Rights.

### IV.

 Although the immunity provisions of the Act are invalid, they are severable from those remaining portions of the Act which can be given effect. Maryland Code (1957, 2011 Repl.Vol.), Article 1, § 23, provides as follows:

"§ 23. **Severability of provisions of statutes.**

The provisions of all statutes enacted after July 1, 1973 are severable unless the statute specifically provides that its provisions are not severable. The finding by a court that some provision of a statute is unconstitutional and void does not affect the validity of the remaining portions of that statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent."

Ch. 114 of the Acts of 1994, which enacted the Reduction of Lead Risk in Housing Act, contained no language which "provides that its provisions are not severable." Moreover, numerous remaining portions of the Reduction of Lead Risk in Housing Act are "[ ]capable of being executed in accordance with the legislative intent." *See Migdal v. State,* 358 Md. 308, 323–324, 747 A.2d 1225, 1233 (2000), discussing and applying Article 1, § 23. It has been commented that many states have reduction of lead poisoning statutes without immunity from suit provisions. T. Harris and L. Smith, *Tort Reform Reform: Maryland's Lead Poisoning Law Needs Overhaul,* 12 U. Balt. Journal of Environmental Law 27, 40 (2004). *Cf. Ashton v. Brown, supra,* 339 Md. at 93–96, 660 A.2d at 459–460, illustrating the type of statute where the valid portions cannot be operative, in accordance with legislative intent, without the invalid portions.

 Even in the absence of a severability statute, "[t]here is a strong presumption that if a portion of an

enactment is found to be invalid, the intent is that such portion be severed." *Board v. Smallwood,* 327 Md. 220, 245, 608 A.2d 1222, 1234 (1992). Under our case law, the principal test is whether " 'the dominant purpose of an enactment may largely be carried out notwithstanding the [enactment's] partial invalidity,' " *Board v. Smallwood, supra,* 327 Md. at 246, 608 A.2d at 1235, quoting *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 601, 375 A.2d 541, 550 (1977). As pointed out earlier in this opinion, § 6–802 of the Act states: "The purpose of this subtitle is to reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing." Granting immunity to landlords is *not* referred to in § 6–802. Accordingly, the dominant purpose of the Act can be given effect without the invalid immunity provisions.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS AND CROSS–PETITIONERS, THE DACKMAN COMPANY, et. al.*