## STATUTES

### SEVERABILITY – LEAD POISONING PREVENTION – "QUALIFIED OFFER" PROVISIONS OF REDUCTION OF LEAD RISK IN HOUSING ACT ARE NOT SEVERABLE FROM THE IMMUNITY PROVISIONS INVALIDATED IN *JACKSON V. DACKMAN*

December 4, 2017

*Patricia McLaine, DrPH, MPH, RN*
*Chair, Maryland Lead Poisoning Prevention Commission*

On behalf of the Maryland Lead Poisoning Prevention Commission, you have inquired about the continuing validity of the qualified offer and insurance provisions of the Reduction of Lead Risk in Housing Act (the "Act") after the Court of Appeals, in *Jackson v. Dackman Co.*, 422 Md. 357 (2011), ruled that the immunity provisions of the Act were unconstitutional. As originally enacted, the Act granted to owners of certain types of rental properties immunity from claims for lead-related injuries so long as the owner (1) complied with various substantive requirements intended to reduce the risk of lead poisoning, and (2) made a so-called "qualified offer" to the person at risk of injury. Md. Code Ann., Envir. §§ 6-828, 6-835, 6-836, 6-836.1.[1] This qualified offer, if accepted, would cover up to $17,000 in moving expenses and medical bills for the person at risk. §§ 6-839, 6-840. The Act also required insurers to offer owners coverage for qualified offers, but insurers could exclude coverage for other lead-related costs and injuries. Md. Code Ann., Ins. § 19-704.

*Dackman* held that the $17,000 available to a lead-poisoned child under the Act was a "totally inadequate" substitute for a personal injury claim and thus the immunity provided by the Act violated Article 19 of the Maryland Declaration of Rights, 422 Md. at 381, which guarantees "[t]hat every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land." At the same time, however, the Court determined that the "immunity provisions" of the Act "are severable from those remaining portions of the Act which can be given effect." *Id.* at 383. You ask whether an owner may still make

---

[1] Unless otherwise indicated, all statutory citations are to the current version of the Environment Article, Annotated Code of Maryland. When we cite to the version in place at the time *Dackman* was decided, we will provide a full citation to the older version.

a qualified offer under the Act and, if so, whether an insurance company would still be required under § 19-704 of the Insurance Article to offer coverage for any accepted qualified offer.

The first question is the critical one. The Court of Appeals did not address the provisions of the Act that are codified in the Insurance Article, so if a qualified offer may still be made and accepted, an insurance company would still be required to offer coverage to owners. It is less clear, however, that a qualified offer may still be made in the first place. Ultimately, we conclude that the qualified offer provisions are so intertwined with the immunity provisions that the General Assembly would not have intended them to operate apart from one another. In our opinion, the qualified offer provisions did not survive the decision in *Dackman*.

# I

## Background

### A. *The Reduction of Lead Risk in Housing Act*

The General Assembly enacted the Reduction of Lead Risk in Housing Act in 1994 to "reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing." § 6-802; *see also* 1994 Md. Laws, ch. 114. As the Court of Appeals has recognized, the Act "was generally based" on the input of the Lead Paint Poisoning Commission, which provided recommendations to the General Assembly in December 1993 and issued a final report in May 1994. *Dackman*, 422 Md. at 361.

The Lead Paint Poisoning Commission concluded in its report that "[c]hildhood lead poisoning is the number one preventable environmental disease affecting children in the United States" and that greater efforts needed to be made to prevent lead poisoning, rather than merely react to it after it had already occurred. Report of the Lead Paint Poisoning Commission at 2-3 (May 5, 1994). The Commission also stated that most insurers since the "mid- to late-1980s have excluded coverage of lead hazards from policies" issued to owners of rental properties and that, in many cases, this "absence of insurance" had prevented children from having a "viable source of recovery for their injuries." *Id.* at 5. To address that problem, the Commission proposed legislation that would require property owners to take affirmative steps to prevent lead poisoning, provide immunity to owners under certain circumstances if they took those affirmative steps, and require insurance companies to offer a limited amount of coverage to

owners for liability arising out of lead-related injuries. *Id.* at 7, App. B (proposed legislation).

The General Assembly largely adopted the Commission's recommendations. As enacted, the Act required the owners of rental properties constructed before 1950—referred to as "affected properties," § 6-801(b)—to register with the Department of the Environment and to comply with other substantive requirements.[2] Most relevant here, owners were required to provide tenants with educational materials about lead poisoning and to meet "risk reduction" standards "designed to reduce the risk of exposure to lead." 82 *Opinions of the Attorney General* 180, 181 (1997) (summarizing the statutory scheme); *see also* Envir. §§ 6-811–6-823 (2007 Repl. Vol.). The owner of an affected property was (and still is) subject to administrative penalties for failure to comply with the Act's registration requirements, § 6-849, and subject to civil penalties for failure to comply with the Act's other substantive requirements, §§ 6-850, 7-266.

More importantly for our purposes, the Act also "place[d] significant limitations on the right of plaintiffs affected by exposure to lead to file a civil suit for damages." 82 *Opinions of the Attorney General* at 181. A plaintiff could not sue an owner for damages unless and until the owner received notice that the relevant "person at risk"—*i.e.*, a child or pregnant woman who lived or regularly spent more than 24 hours per week at the property, § 6-801(p)—was suffering from an elevated blood lead ("EBL") level above a threshold set by the statute. § 6-828. Once the owner received notice of an EBL level above the threshold limits in § 6-828, the owner (or the owner's agent or insurer) then had 30 days to make a "qualified offer" to the person at risk. § 6-831(c)(1).

A qualified offer had to "include payment for reasonable expenses and costs" of up to $9,500 for relocation of the household of the person at risk and up to $7,500 for medical treatment not

---

[2]   The legislation focused on units constructed prior to 1950 because they are more likely to have lead paint than units constructed thereafter. *See* Maryland Department of the Environment, 2011 Lead Summer Study Report at 9 (Dec. 31, 2011) (stating that the incidence of lead paint drops from 95 percent in pre-1950 units to 80 percent for units built between 1950 and 1960, and that the incidence of lead paint "drops off rapidly until 1978," when the federal Consumer Product Safety Commission banned the residential use of lead-based paint); 42 Fed. Reg. 44199 (Sept. 1, 1977) (promulgating federal ban, effective 180 days thereafter).

otherwise covered by insurance or a medical assistance program. §§ 6-839, 6-840. With limited exceptions, the money would be paid to the entity providing the medical or relocation services, not directly to the person at risk. *Dackman*, 422 Md. at 366 (citing § 6-840(b)). The owner had to submit the qualified offer on a form that was provided by the Department, *see* COMAR 26.16.03.03A, and that summarized the tenant's rights, *see* COMAR 26.16.03.04.

The person at risk—or, if the person at risk was a child, a parent or guardian—then had to choose whether to accept or reject the qualified offer. Each choice had ramifications for both the owner and the person at risk. If the person at risk accepted the offer, the owner's insurer was required to cover the amount of the offer, even if the insurer otherwise excluded coverage for lead-related injuries. Ins. § 19-704 (2011 Repl. Vol.). The claimant thus was guaranteed recovery of up to $17,000 for relocation and medical expenses. At the same time, however, acceptance of the offer "discharge[d] and release[d] all potential liability" of the owner and insurance company for any injuries or loss "caused by the ingestion of lead by the person at risk in the affected property." § 6-835.

If the person at risk *rejected* the offer, the owner still had immunity from liability, but only if the owner had complied with the registration requirements in Part III of the Act and the notice and risk reduction requirements in Part IV. § 6-836; *see also* COMAR 26.16.03.04 ("If your landlord did everything the law requires him/her to do, you will not be able to sue your landlord for any damages that may have been caused by lead, even if you do not accept this Qualified Offer."). Claimants could file suit to challenge the owner's entitlement to this immunity, in which case the statute provided for a bifurcated proceeding. The court would first determine whether the owner had complied with the statute's substantive requirements and thus was entitled to immunity and, if necessary, hold a jury trial to resolve that issue. § 6-836.1. If the court determined during this first stage that an owner was *not* in compliance with any of the Act's substantive requirements, the case would proceed to the merits of the plaintiff's personal injury claim. At that point, an owner who had not complied with the notice and risk reduction requirements in Part IV of the Act was "presumed to have failed to exercise reasonable care with respect to lead hazards." Envir. § 6-838 (2007 Repl. Vol.).

## *B.* **Dackman** *and its Aftermath*

In *Dackman*, the Court of Appeals considered the constitutionality of "the immunity granted . . . by §§ 6-828, 6-835, 6-836, and 6-836.1 of the Act." 422 Md. at 380. The Court explained that, although the Legislature may abolish a common-law tort remedy and substitute a statutory remedy, the new remedy must be "reasonable." *Id.* According to the Court, the Act's remedy was not reasonable for two reasons: the $17,000 "maximum amount of compensation under a qualified offer is miniscule" and "drastically inadequate," and the Act operated to bar the claims of minor children before they reached the age of majority.[3] *Id.* at 382. The Court therefore held that the immunity provisions of the Act violated Article 19 of the Maryland Declaration of Rights. *Id.* at 383.

Although the Court struck down the Act's immunity provisions, it concluded that the provisions "are severable from those remaining portions of the Act which can be given effect." *Id.* The Court reasoned that "numerous remaining portions of the [Act] are capable of being executed in accordance with the legislative intent," *id.*, which was to "'reduce the incidence of childhood lead poisoning, while maintaining the stock of available affordable rental housing.'" *Id.* at 384 (quoting § 6-802). The Court did not, however, specify which of the "remaining portions" of the Act could be given effect.

In the years since *Dackman* was decided, the Legislature has neither repealed the provisions governing qualified offers nor expressly clarified whether an owner may still make a qualified offer. Although the General Assembly considered legislation to revive the immunity provisions by increasing the amount of a qualified offer, those efforts failed.[4] The Legislature instead

---

[3] In addition, a person at risk with a blood lead level *below* the threshold likely would have been left without *any* remedy because he or she would not have been able to receive a qualified offer and thus would never have met the necessary prerequisites for filing suit. *See Dackman*, 422 Md. at 369 n.8 (discussing issue, but declining to resolve it because the provision was unconstitutional in any event); *see also id.* at 381 ("Where no qualified offer is made, the plaintiffs have no remedy under the statute.").

[4] *See* House Bill 1477 (2012) (replacing the $17,000 cap on liability with an agency-devised formula for determining liability); House Bill 754 (2013) (increasing to $25,000 the amount provided under a qualified

amended the Act to repeal the statutory presumption that an owner who failed to comply with the notice and risk reduction requirements of the Part IV of the Act was presumed to have failed to exercise reasonable care. In its place, the amendment added new language providing merely that evidence of an owner's compliance or non-compliance with the standards of care in the Act is admissible on the issue of whether the owner exercised reasonable care. 2012 Md. Laws, ch. 387 (amending § 6-838).

That same legislation changed the statutory scheme in other ways as well. Most significantly, the Legislature expanded the scope of the Act to include rental properties built before 1978, not just those built before 1950. § 6-801(b)(1)(ii) (revising definition of "affected property"). The Legislature did not, however, amend the provisions in the Insurance Article requiring insurers to offer coverage for qualified offers; the definition of "affected property" for those provisions is still limited to "residential rental property constructed *before 1950*." Ins. § 19-701(b)(1) (emphasis added).

## II

## Analysis

You ask whether, after *Dackman*, an owner may still make a qualified offer under § 6-831 of the Environment Article and, if so, whether an insurance company would still be required under § 19-704 of the Insurance Article to offer coverage for a qualified offer. In essence, your question is whether the qualified offer provisions of the Act are severable from the immunity provisions of the Act struck down by the Court of Appeals in *Dackman*.

*Dackman* itself resolved at least part of the severability question at issue here. After striking down the Act's immunity provisions, the Court declined to invalidate the Act as a whole, concluding that the "dominant purpose of the Act can be given effect without the invalid immunity provisions." *Dackman*, 422 Md. at 384 (internal quotation marks omitted). Because the Court specifically identified the immunity provisions as §§ 6-828, 6-835, 6-836, and 6-836.1, *id.* at 380, and expressly invalidated only those provisions as unconstitutional, one could conclude that *all* other

---

offer for relocation and medical expenses, providing an amount up to $15,000 for supplemental educational expenses, and providing additional amounts to compensate for lost earnings and the cost of living with the risk of lead paint hazard).

provisions of the Act—including § 6-831, which authorizes property owners to make qualified offers—remain valid.

However, other considerations suggest that the Court intended to leave open the possibility that some provisions of the Act might not be severable from the immunity provisions. The Court noted that "*numerous* remaining portions of the [Act]," rather than all of them, "are capable of being executed in accordance with the legislative intent," and it concluded that the immunity provisions "are severable from *those* remaining portions of the Act which can be given effect." *Id.* at 383 (emphases added; brackets omitted). If the Court had intended to decide definitively that *every* provision of the Act was severable from the immunity provisions, it could have done so in language far more straightforward than this. Instead, the language seems carefully crafted to accommodate the possibility that—in an appropriate case—other provisions of the Act might be deemed non-severable. After all, the Court in *Dackman* had no occasion to address the continuing validity of qualified offers because the claimant had not received one. *Id.* at 381. Given the posture of the case, the Court's failure to address the continuing validity of qualified offers does not validate them by negative implication.[5] We thus must resolve the issue left open in *Dackman*: whether the provisions of the Act governing qualified offers are among "those remaining portions of the Act which can be given effect."

"[T]he question of severability is in every case a question of legislative intent." 73 *Opinions of the Attorney General* 78, 83 (1988). "The intent to be ascertained, however, is not *actual* legislative intent, as the Legislature obviously intended to enact the statute as written in its entirety." *Turner v. State*, 299 Md. 565, 576 (1984) (emphasis added). Instead, we must determine "what would have been the intent of the legislative body, if it had known that the statute could be only partially effective." *Id.*; *see also* 73 *Opinions*

---

[5] We recognize that, in a later case, the Court of Appeals stated in a footnote that its "holding in *Jackson v. Dackman Co.* only found the immunity provisions of the Lead Act invalid" and that it had "severed the remainder of the Lead Act that did not speak to potential immunity from the invalid portions." *Housing Auth. of Baltimore City v. Woodland*, 438 Md. 415, 439 n.13 (2014). Although this later description of *Dackman* could be read to mean that all other provisions of the Act—including the qualified offer provisions—are severable, the Court still had no occasion to decide that issue in *Woodland*; it was merely correcting the lower court's suggestion that *Dackman* had invalidated the *entire* Lead Act, which obviously it did not do. *See id.* at 439.

*of the Attorney General* at 83. In determining this hypothetical intent, we must presume that the Legislature intends its enactments to be severed "whenever possible" so as to "separate the valid from the invalid provisions." *Davis v. State*, 294 Md. 370, 383 (1982). The General Assembly has codified this presumption, declaring that, "[e]xcept as otherwise provided, the provisions of all statutes enacted after July 1, 1973, are severable." Md. Code Ann., Gen. Prov. § 1-210(a). Accordingly, "[t]he finding by a court that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless the Court finds that the remaining valid portions alone are incomplete and incapable of being executed in accordance with legislative intent." *Id.* § 1-210(b).

The "principal test" for making this determination "is whether the dominant purpose of an enactment may largely be carried out notwithstanding the enactment's partial invalidity." *Dackman*, 422 Md. at 384 (internal quotation marks and brackets omitted); *see also* 73 *Opinions of the Attorney General* at 84 ("The true test of severability is whether, without the operative provision, the statute would still be effective to carry out the dominant legislative intent."). If so, the remaining provisions of the statute should generally be given effect.

But the remaining provisions will *not* be severed where it would create "a situation which could not have been intended by the Legislature." *Maryland Theatrical Corp. v. Brennan*, 180 Md. 377, 386 (1942). For instance, otherwise valid provisions will not be severed where they are "inextricably mingled" with the invalid ones, *Police Comm'r of Baltimore City v. Siegel Enters., Inc.*, 223 Md. 110, 133 (1960), where "the two sets of provisions [are] 'inseparably connected in substance,'" *Sugarloaf Citizens Ass'n v. Gudis*, 319 Md. 558, 576 (1990) (quoting *Baltimore v. O'Conor*, 147 Md. 639, 654 (1925)), where "those parts which might be held valid become so inoperative and inexplicable as to deprive the Act of its purposes and force," *Brennan*, 180 Md. at 387, or where the valid portions "are impractical and useless without the invalid portions," *Heubeck v. City of Baltimore*, 205 Md. 203, 212 (1954).[6]

---

[6] The severability inquiry is not a binary choice between severing only the invalid provisions or invalidating the entire act. *See* Kenneth A. Klukowski, *Severability Doctrine: How Much of A Statute Should Federal Courts Invalidate?*, 16 Tex. Rev. L. & Pol. 1, 28 (2011). A statute instead may be *partially* severable, meaning that a court may

In our view, the qualified offer provisions are not severable from the immunity provisions. The two sets of provisions are "inseparably connected in substance," *Sugarloaf Citizens Ass'n*, 319 Md. at 576 (quoting *O'Conor*, 147 Md. at 654); they are structurally, textually, and functionally interdependent. Structurally, all of the immunity provisions fall within Part V of the statute, which governs "Qualified Offers," and which "applies to all potential bases of liability," § 6-827. Qualified offers are thus an integral part of the liability limitation that *Dackman* invalidated.[7] Textually, the qualified offer provisions refer to, and depend on, the invalidated immunity provisions. For example, § 6-831 authorizes the issuance of qualified offers and requires the owner to make the qualified offer "within 30 days after the offeror receives notice [of an EBL level] under § 6-828 of this subtitle." § 6-831(c)(1). Section 6-828—which *Dackman* invalidated—establishes the elevated blood lead levels at which the owner must be provided notice and the "opportunity to make a qualified offer under § 6-831." One cannot read and make sense of one without the other.

The two provisions are also functionally interdependent. Continuing the comparison from the preceding paragraph, the Court's invalidation of § 6-828 means that the statute is silent on what blood lead levels require the notice that triggers the owner's ability to make a qualified offer and silent on when he must make such an offer. More importantly, the provisions that set forth the Act's liability restrictions necessarily hinge on whether a qualified offer has been made. *See* § 6-835 (acceptance of qualified offer "releases all potential liability"), § 6-836 (owner "not liable" under certain circumstances where tenant rejects qualified offer). In the wake of the Court's invalidation of § 6-835, the Act no longer addresses whether accepting a qualified offer would waive a

---

strike down some provisions of the statute as non-severable, while "still retaining much of the statute at issue." *Id.* (citing *Planned Parenthood v. Danforth*, 428 U.S. 52 (1976), and *Railroad Ret. Bd. v. Alton R.R.*, 295 U.S. 330, 361 (1935)); *see also Bell v. Board of Comm'rs of Prince George's County*, 195 Md. 21, 32 (1950) (stating that a court must "try to uphold *all* parts of an act which can be put in force" without the invalid provisions (emphasis added)); *Schneider v. Duer*, 170 Md. 326, 336 (1936) (noting that "a statute may be valid in part and void in part, even when the two parts are contained in the same section").

[7] An exception is § 6-838, which was amended after *Dackman* to adjust the evidentiary effect of an owner's compliance with the risk reduction standards in Part IV of the Act. *See* 2012 Md. Laws, ch. 387.

tenant's claims—as would the acceptance of a settlement offer more generally—or whether the invalidity of the immunity provisions means that the tenant could bring a tort suit even after accepting the offer. In this way, each provision is incomplete without the other.

We find the Court of Appeals' decision in *Heubeck* instructive here. *Heubeck* involved a local rent control ordinance that (1) capped the amount of rent the landlord could charge, and (2) prohibited the eviction of a tenant who was holding over beyond the end of his lease, as long as the tenant continued to pay rent. The Court invalidated the non-eviction provision on the grounds that it was preempted by public general law. 205 Md. at 210-11. The Court then held that the rent control provision of the ordinance was not severable because the legislative body considered "the problem of evictions to be an integral part of the problem of rent regulation," and thus both provisions—rent control *and* eviction protection— were "equally essential to the declared purpose" of the law. *Id.* at 212 (quoting *F. T. B Realty Corp. v. Goodman*, 300 N.Y. 140, 148 (1949)). The Court concluded:

> To establish a maximum rent for a dwelling unit without being able to prevent an eviction upon the expiration of the tenant's lease despite his willingness to continue to pay the prescribed rent would be a futile means indeed to achieve the ends for which the ordinance was enacted. As the valid portions of the ordinance are impractical and useless without the invalid portions, the entire ordinance must fall.

*Id.*

Applying the rationale of *Heubeck* here suggests that the qualified offer provisions must suffer the same fate as the invalidated immunity provisions. Just as the rent control and eviction-protection provisions were "integral" and "equally essential" to the purposes of the statute at issue in *Heubeck*, *id.*, the qualified offer, immunity, and insurance provisions are essential parts of an integrated legislative plan to "reduce the incidence of childhood lead poisoning" while "maintaining the stock of available affordable rental housing." § 6-802. The qualified offer and insurance requirements advance the first of these competing goals by guaranteeing tenants with elevated blood levels the means to move into lead-safe housing and to cover at least some of their

medical expenses. The immunity provisions give owners the incentive to make a qualified offer—thus advancing the Act's public health goal—while ensuring that the prospect of tort liability does not drive owners from the affordable housing market—the Act's second goal. At the same time, the immunity provisions also give affected tenants the incentive to accept the qualified offer, because if they reject it, they might find themselves without *any* recovery. *See* § 6-836. In these interrelated and mutually supporting ways, all three provisions worked together to advance the Act's policy goals.

And just as the rent control provisions of the ordinance at issue in *Heubeck* could not be meaningfully enforced without the invalid eviction provisions, the qualified offer provisions of the Act become "impractical and useless" without the invalid immunity provisions. Owners now have little incentive to make qualified offers when doing so will not protect them from potentially crippling tort liability. And without the compulsive effect of § 6-836—which, under certain conditions, gives an owner immunity even if the tenant *rejects* the qualified offer—tenants have little incentive to accept a qualified offer even if one were offered. In fact, it appears that *no* qualified offers were made and accepted in the five years after *Dackman* was decided. *See* Minutes of Lead Poisoning Prevention Commission Meeting, at 3 (May 6, 2016).[8] If the marketplace tells us anything, it is that the qualified offer provisions are now considered "impractical and useless" to serve the purposes for which they were enacted. *Heubeck*, 205 Md. at 212

The legislative history surrounding the bills introduced in the wake of *Dackman*—House Bills 472, 644, and H.B. 1477 in the 2012 session, and House Bill 754 and in the 2013 session—suggests that the Legislature too was operating under the assumption that the qualified offer provisions were no longer

---

[8]    Even before *Dackman*, few qualified offers were made or accepted. From the implementation of the Act in 1996 until the date of the *Dackman* decision in 2011, landlords made 144 qualified offers, of which 61—about four per year—were accepted. *See* Maryland Ins. Admin., Report of the Workgroup on Lead Liability Protection for Owners of Pre-1978 Rental Property at 6 (Nov. 2012). By contrast, tenants filed 656 lead poisoning suits in 2011 alone. *Id.* Given how few qualified offers were made and accepted when the immunity provisions were in effect, it is not surprising that owners and tenants would find them of little use in the absence of those provisions.

effective after *Dackman*. The written testimony submitted by representatives of owners and tenants alike described *Dackman* as having declared the Act's qualified offer provisions unconstitutional.[9] There is no indication in the relevant bill files that anyone—legislator or commenter—understood that qualified offers continued to function as a viable part of the legislative scheme after *Dackman*.

The two bills that were enacted by the General Assembly in the wake of *Dackman*—H.B. 472 and H.B. 644—similarly reflect the understanding that the Act's qualified offer provisions did not survive *Dackman*. As proposed, House Bill 472 would have created a Lead Poisoning Compensation Fund from which the owners of affected properties could draw up to $200,000 to cover

---

[9] *See*, *e.g.*, Hearing on H.B. 472 Before the House Environmental Matters Committee, 2012 Leg., Reg. Sess. (Testimony of the Property Owners Assn. of Maryland, Inc., stating that *Dackman* "ruled that the Qualified Offer mechanism in its structure and operation violated Article 19 of Maryland's Declaration of Rights and struck down Part V of Maryland's lead law in its entirety" (March 7, 2012)); *id.* (Testimony of Greater Baltimore Board of Realtors, stating that *Dackman* "held that the qualified offer provision of Maryland's lead paint poisoning prevention law was unconstitutional"); Hearing on H.B. 1477 Before the House Environmental Matters Committee, 2012 Leg., Reg. Sess. (Testimony of Maryland Multi-Housing Assn., Inc., urging the adoption of amendments that would "reinstate the qualified offer provision"); *id.* (Testimony of Insurance Inc., stating that "the Qualified Lead Offer Law . . . was rendered moot by the Court of Appeals"); Hearing on H.B. 754 Before the House Environmental Matters Committee, 2013 Leg., Reg. Sess. (Feb. 22, 2013) (Testimony of Public Justice Center, stating that *Dackman* "found that the 'Qualified Offer' provision of the [Act] violated Article 19," and that the proposed bill "does not sufficiently fix the unconstitutionality of the 'Qualified Offer'"); *id.* (Testimony of Saul E. Kerpelman & Assocs., stating that the firm represented Ms. Jackson in the *Dackman* litigation and that the Court "overturn[ed] the qualified offer system while leaving the safety provisions of the Act in effect"). Documents prepared by the Department of Legislative Services focused more on the invalidity of the immunity provisions, but still tied them to the qualified offer provisions. *See* Fiscal and Policy Note on H.B. 472 (stating that the Act "provides liability protection, through a qualified offer," but that the Act's "liability protection provisions . . . have been rendered invalid"); Floor Report for H.B. 1477 (stating that *Dackman* "held the limited liability provisions under [the Act] to be invalid under Article 19 because a qualified offer does not provide a reasonable remedy").

lead paint-related liabilities, but was amended to refer the issue of liability protection to a newly-established workgroup. *See generally* 2012 Md. Laws, ch. 373. Qualified offers were not included in either version of the bill, and language directing the workgroup to consider the "feasibility of a modified qualified offer framework" was deleted from the final version of the bill. *Id.* at p.16.[10] The bill contains no indication that the General Assembly understood that qualified offers remained a viable source of compensation after *Dackman.* Instead, it was designed to create an entirely *new* means of protecting owners from the economic impact of tort liability.

House Bill 644, for its part, expanded the Act's definition of "affected property" to include properties constructed between 1950 and 1978, but left unchanged the definition of "affected property" in the Insurance Article, which remains to this day "residential rental property constructed before 1950." 2012 Md. Laws, ch. 387; Ins. § 19-701(b)(1). As a result, if qualified offers could still be made after *Dackman*, the Act would require an insurer to cover them for properties built before 1950, but not for properties built between 1950 and 1978—a result that would effectively place newer, less-contaminated properties in a worse position than older properties. We see no evidence that the General Assembly made such a policy choice.

Instead, if the General Assembly had thought that the qualified offer provisions were still effective, it presumably would have expanded the obligation of insurers to offer coverage for qualified offers to all properties built before 1978. After all, the statute, as enacted, provided owners with two incentives to make a qualified offer: (1) immunity from liability; and (2) guaranteed insurance coverage. Given that *Dackman* invalidated the Act's immunity provisions, it seems unlikely that the General Assembly, if it believed qualified offers remained viable, would have failed to include the only other statutory incentive to make one. The Legislature's failure to do so makes more sense if the qualified offer provisions did not survive *Dackman*.

---

[10] The legislatively-created workgroup ultimately concluded that a compensation fund was not financially viable. *See* Maryland Ins. Admin., Report of the Workgroup on Lead Liability Protection for Owners of Pre-1978 Rental Property.

We recognize that there is at least a theoretical possibility that a qualified offer might still be made and accepted.[11] An owner could conceivably choose to make such an offer, either out of a genuine desire to re-locate and treat an at-risk child or out of self-interest, with the expectation that removing and treating the child would improve the child's health and thus marginally reduce the owner's ultimate liability. It seems unlikely, however, that such a marginal reduction would meaningfully help to "maintain[] the stock of available affordable rental housing"—and thus satisfy one part of the law's dual purpose—if it does not simultaneously immunize the owner from liability.

*Heubeck* is instructive here as well. In that case, the Court concluded that the rent control provisions of the ordinance were not severable from the provisions protecting tenants against eviction even though holding down rents might benefit tenants during their lease terms and thus fulfill at least part of the statute's purpose. The salient inquiry thus was not whether rent control might advance a portion of the statutory purpose, but whether the Legislature had enacted rent control as an "integral part" of a single, unitary policy choice. 205 Md. at 212. Because the Court found that the General Assembly had made such a unitary choice, "'the one set of restrictions cannot be separated from the other except by a remodeling of the law on a scale which, as we believe, would be beyond the judicial power.'" *Id.* (quoting *Goodman*, 300 N.Y. at 148 (invalidating both the rent control and eviction-protection provisions of a New York City ordinance when they were "equally essential to the declared purpose" of the law)).[12]

---

[11] There is some indication that the Court does not consider the *theoretical* usefulness of a provision in deciding whether to sever it from the invalid provisions of a statute. For example, in *Howard County Metropolitan Commission v. Westphal*, the Court found it "[o]bvious[]" that a provision which allowed the Board of County Commissioners to break a tie vote of a local commission was not severable from a provision increasing the size of that commission from three to four members, 232 Md. 334, 342 (1963), even though it was at least theoretically possible that a three-member commission might end up deadlocked if, for example, one member abstained.

[12] In addition to *Goodman*, the Court in *Heubeck* also found noteworthy that the General Assembly had authorized the enactment of local ordinances regulating "the conditions under which evictions from housing accommodations may be made" to the same extent as its power to authorize the State "regulation and control of rents of housing

We also recognize that a qualified offer, if accepted, would tend to "reduce the incidence of childhood lead poisoning"—and thus advance the second part of the statute's dual purpose, § 6-802—by relocating at-risk children and covering a portion of their medical expenses. That benefit, however, would come at the significant risk that an unsophisticated tenant would believe he had little choice but to accept the offer or lose the ability to recover anything. After all, the qualified offer is supposed to come soon after the owner receives notice, and the tenant has only 30 days in which to decide whether to accept it. §§ 6-831, 6-834(b), (c). With limited time and resources to consult counsel, there is a real possibility that a tenant might accept a qualified offer without understanding the consequences of doing so, especially when the invalid immunity provisions are still codified in statute and regulation.[13] In our view, the risk of confusion about the effect of a qualified offer on the owner's liability outweighs any theoretical possibility that an owner might make (and a tenant might accept) a qualified offer.

In our view, the General Assembly intended that the immunity, qualified offer, and insurance provisions would all function interdependently to further the statute's dual purpose of addressing childhood lead-poisoning without driving landlords from the market for low-income housing. They are of a piece, part of a single legislative policy choice. *See Outmezguine v. State*, 335 Md. 20, 41 (1994) ("The plain language cannot be viewed in isolation; rather, the entire statutory scheme must be analyzed as a whole."). Allowing the qualified offer and insurance parts of that policy choice to remain in place without the immunity provisions

---

accommodations." 205 Md. at 212 (citing Md. Ann. Code Ann., art. 44C, § 2(c) (1951).

[13] The Court of Appeals did not have occasion to address whether a tenant's *voluntary* acceptance of a "qualified" offer outside of the Act's framework would resolve the owner's common-law liability, or whether a settlement based on a "totally inadequate and unreasonable" offer, *Dackman*, 422 Md. at 381, would be void as against public policy. *See Maryland-Nat'l Capital Park & Planning Comm'n v. Washington Nat. Arena*, 282 Md. 588, 606 (1978) (stating that courts will void an agreement as against public policy "only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would . . . pronounce it' invalid") (quoting *Estate of Woods, Week & Co.*, 52 Md. 520, 536 (1879)).

would constitute a "remodeling of the law on a scale which," we think, "would be beyond the judicial power," *Heubeck*, 205 Md. at 212 (quoting *Goodman*, 300 N.Y. at 148), and well beyond our interpretive role.

We thus conclude that the qualified offer provisions are not severable from the immunity provisions and are no longer effective.[14] In doing so, we reiterate that there is a presumption in favor of severability and that, in most cases, all of the provisions of a particular statute will be severable from the invalid portions. *See*, *e.g.*, *Davis*, 294 Md. at 383. But severability is ultimately a question of legislative intent, 73 *Opinions of the Attorney General* at 83, and under the circumstances here, we believe that the Legislature would not have intended the qualified offer and insurance provisions to remain in effect without the related immunity provisions. In light of our conclusion—and to prevent confusion among tenants, landlords, and insurers—we recommend that the Department of the Environment rescind its regulations governing qualified offers and that the General Assembly enact clarifying legislation repealing or revising the qualified offer provisions.

### III

### Conclusion

In our opinion, the qualified offer and insurance provisions of the Reduction of Lead Risk in Housing Act are not severable from the immunity provisions invalidated by the Court of Appeals in *Dackman*. A qualified offer thus may no longer be made under § 6-831 of the Act, and insurers no longer need to offer coverage

---

[14] This does not mean that all of the provisions in Part V of the Act are necessarily invalid. For instance, § 6-838 merely provides that whether a property owner was or was not in compliance with the risk reduction requirements in Part IV "is admissible as evidence" that the owner either exercised reasonable care or failed to do so. This provision is not inextricably intertwined with the invalid immunity provisions and would be severable. We also have no doubt of the continuing validity of the registration requirements in Part III of the Act and the notice and risk reduction requirements in Part IV. Those substantive requirements remain both practical and useful because the Department has the power to enforce them: As noted above, if the owner of an "affected property" fails to comply with these provisions, the owner is subject to administrative or civil penalties. *See* §§ 6-849, 6-850, 7-266.

to property owners for qualified offers under § 19-704 of the Insurance Article.

<div style="margin-left: 40%">

Brian E. Frosh
Attorney General of Maryland

Patrick B. Hughes
Assistant Attorney General

</div>

Adam D. Snyder
Chief Counsel, Opinions & Advice